Argued and submitted May 4, applicant's application for admission to
Oregon State Bar allowed August 18, 2005

# In the Matter of the Application of

# SEAN McCARVER BEERS

# For Admission to the Oregon State Bar.

## (SC S51895)

118 P3d 784

Bradley F. Tellam, Barran Liebman LLP, Portland, argued the cause and filed the briefs for the applicant. With him on the briefs was Brenda K. Baumgart.

Jeffrey D. Sapiro, counsel for Board of Bar Examiners, Lake Oswego, argued the cause and filed the brief for the board.

PER CURIAM

## PER CURIAM

The issues in this contested lawyer admission proceeding are whether *former* Rule for Admission of Attorneys (RFA) 3.10 (2002)[1] bars applicant's admission and, if not, whether applicant has proven by clear and convincing evidence that he presently possesses the moral character and fitness necessary for admission to the Oregon State Bar. On *de novo* review, we find that although applicant participated in substantial illicit drug activity in the past, he has overcome his drug dependence and reformed such that he is qualified for admission to the Bar.

Applicant began using marijuana and alcohol when he was 12 years old. During high school, he progressed to more serious drugs, and cocaine became his drug of choice. Applicant also began selling drugs to his friends and classmates to support his drug use. In 1983, when applicant was 17, he dropped out of high school and left home. He completed his GED and worked a variety of jobs while continuing to use drugs. At one point, applicant contacted his parents for help, and his mother took him to a residential drug treatment program. Although applicant was supposed to remain in the program for six to eight weeks, he left after just a few days.

Applicant resumed using drugs and became more involved in selling them. During the late 1980s and early 1990s, applicant was convicted of felony possession of a controlled substance, for which he served a few months in county jail, and a variety of misdemeanors including unlawful possession of a concealed weapon, shoplifting, and driving under the influence. Applicant also violated the terms of his probation by continuing to use drugs and alcohol and by paying someone else to impersonate him at a court-ordered drug treatment program. During that time, applicant also had

---

[1] RFA 3.10 (2002) provided:

"An applicant shall not be eligible to apply for admission to the Bar after having been convicted of a crime, the commission of which would have led to disbarment in all the circumstances present, had the person been an Oregon attorney at the time of conviction."

Unless otherwise specified, all references to RFA 3.10 in this opinion are to RFA 3.10 (2002). RFA 3.10, in its present form, omits the phrase "to apply."

numerous traffic violations and failed to appear in court multiple times, leading to warrants for his arrest. In addition, on two occasions, applicant gave police officers a false name.

Applicant's drug-related activity continued to escalate. By late 1991, applicant was a mid-level drug dealer; he would buy large quantities of cocaine and sell to other dealers. In April 1992, the California police arrested him during a drug sting, and a grand jury charged him with conspiracy to distribute cocaine. He pleaded guilty to the felony drug charge and served approximately three years of a five-year sentence in a California state prison.

While in prison, applicant began to turn his life around. Applicant stopped using drugs, began taking college courses, and dealt with his unresolved criminal charges and warrants. After his release in 1994, applicant returned to Oregon. He continued his college education. He also obtained a bookkeeper position with a small software company. After about nine months, applicant applied for a part-time computer operator position with Smith Barney, an investment firm.

After being offered the job, applicant spent two days learning Smith Barney's computer system. On his second day, applicant told the assistant manager about his felony conviction. Although the assistant manager thought that applicant had paid his debt to society, he talked with his supervisors at Smith Barney. Ultimately, they decided not to employ applicant because they were unsure, based on his background, if they would be able to obtain a bond for him.

After his experience at Smith Barney, applicant accurately answered the questions that prospective employers asked him.[2] However, he did not go beyond answering the specific questions that they asked or disclose his prior drug use or convictions. In late 1995, applicant successfully applied for part-time positions with two companies, Bardsley Neidhart, a market research company, and Fi.Comm, an investor relations firm. Applicant worked the two part-time jobs simultaneously for a short time before getting a full-time position with Fi.Comm. Based on his work, the president of

---

[2] One exception occurred, which we discuss below.

Fi.Comm promoted applicant to be an account executive. In that position, applicant worked with public companies and managed the release of those companies' information to current and potential investors. Over the next two years, while working full time at Fi.Comm, applicant got married, earned a Bachelor of Science degree in Business Administration from Linfield College, and completed his parole.

Columbia Sportswear was one of the clients that applicant worked with as a Fi.Comm account executive. In 1998, Columbia decided to bring their investor relations work in-house. Having been impressed with applicant's work, Columbia asked him to work as its Director of Investor Relations. Applicant accepted the offer and did not fill out a formal job application until after he had begun work at Columbia. That application asked whether applicant had been convicted of a crime involving dishonesty or breach of trust. Applicant answered that question "no." He did not go beyond that question and disclose his previous drug convictions. However, after he had been working at Columbia for about six months, he came forward and voluntarily told his employer about his prior convictions and past drug use.

Applicant first disclosed his prior convictions and former drug use to his direct supervisor, Tim Boyle. Although applicant's past surprised Boyle, Boyle remained impressed with applicant's abilities and performance. Boyle told applicant that he should talk about his convictions with Columbia's general counsel, Davis. Davis, who previously had been a prosecutor, stated that applicant's disclosure did not lead him to question either applicant's ability to do his job or his trustworthiness. However, some other Columbia employees questioned whether applicant had lied on his employment application when answering the question about convictions. Davis pulled applicant's file, read his employment application, and determined that applicant had truthfully answered the questions.

Applicant's supervisors at Columbia found applicant to be bright, hard-working, and very competent. The company received an investor relations award, and Columbia's president and CEO explained that the award "was primarily based on [applicant's] diligent work." Applicant's supervisors

recommended him for a promotion, and a Columbia executive selected applicant, from a group of qualified employees, to be the Director of Operations for Columbia's new Sorel division.

When applicant raised the idea of attending law school, his Columbia supervisors were supportive. So, while working full time at Columbia and raising three children with his wife, applicant also began attending the night program at Lewis & Clark Law School. During law school, applicant studied for and passed the Certified Public Accountant exam and received his accounting license from the Oregon Board of Accountancy. Applicant also began serving as a member of the board of directors of the National Crime Victims Law Institute. In 2002, applicant graduated in the top half of his class from Lewis & Clark Law School.

Applicant has remained drug free since his conviction in 1992. He continues to drink alcohol occasionally and has done so, with one exception, in moderation. That exception occurred in 2000 while applicant was a student at Lewis & Clark Law School. He became intoxicated at a Portland Waterfront festival. As he was leaving the festival, applicant jaywalked in front of a police officer. The officer and applicant had a brief exchange, and the officer took applicant to the Hooper Center Sobering Station where he remained for two hours before being released.

After graduating from law school, applicant applied to sit for the July 2002 bar examination and for admission to practice law in Oregon. On his application, applicant completely disclosed his past convictions and drug use as well as the fact that he had numerous traffic and parking tickets. At the Board of Bar Examiners' request, applicant participated in a small group interview with two board members and provided additional information and documents relating to his past. Applicant also told the board of relevant events that had occurred since submitting his application, such as receiving traffic tickets and being invited to join the Board of the Portland Youth Philharmonic. The board allowed applicant to sit for the July 2002 bar examination but reserved the right to determine whether he was qualified for admission.

Applicant passed the bar examination, but the board determined that he was not eligible to apply for admission to

the Bar pursuant to RFA 3.10. That rule prohibits an applicant from applying for admission to the Bar if the applicant has been convicted of a crime that would have resulted in disbarment had the applicant been a lawyer. Pursuant to the board's recommendation, this court notified applicant that he was not eligible to apply for admission, and applicant filed a petition for reconsideration and waiver of RFA 3.10. In his petition, applicant offered substantial evidence that he had reformed. He also argued that (1) RFA 3.10 violated his due process rights because it did not provide for a hearing; (2) RFA 3.10 contains an unworkable test in that many of the criteria that the court considers in determining whether to disbar a lawyer are not applicable to nonlawyers; and (3) RFA 3.10 is inconsistent with ORS 9.220(2)(a) because that statute requires that an applicant possess the requisite moral character and fitness to practice law at the time of application.

The board did not oppose applicant's petition. This court allowed the petition for reconsideration and waiver in November 2002. The court issued the following order:

> "Sean McCarver Beers has petitioned for reconsideration of the court's decision that he is not eligible to apply for admission to the practice of law in Oregon, and for waiver of Rule for Admission 3.10. The petition is allowed.

> "IT IS ORDERED that Rule for Admission 3.10 is waived to the extent that Mr. Beers shall be permitted to apply for admission to the practice of law in Oregon. Further, Mr. Beers' application is remanded to the Board of Bar Examiners for a character and fitness hearing."

The board held applicant's character and fitness hearing over two days in May and June of 2004. In addition to evidence concerning whether applicant had omitted information in applying for work or admission, an issue that we discuss below, the evidence at the hearing fell primarily into two categories: character references and a psychological evaluation of applicant.

Nineteen persons from the legal and business communities came forward on applicant's behalf. They included a retired Oregon judge, the dean of Lewis & Clark Law School, top executives from Columbia, former business clients and

employers, and numerous members of the Bar. All of them supported applicant's admission to the Bar. The recommendation from Peter Bragdon, former chief of staff to the Governor and current general counsel at Columbia, is typical. Bragdon explained that he had known applicant since 1998 and that applicant had been forthright with Bragdon about his past. Bragdon stated:

"[Applicant] made some significant mistakes earlier in his life. I am convinced that he understands that, and that he has worked overtime since then to make up for those errors and improve himself and the lives of those around him. Columbia is certainly better off for his efforts, as are the friends and others who surround him. He has earned the trust and confidence of all of us at Columbia, through hard work and forthright behavior. In the several years I have known and worked with [applicant], I have never had occasion to question his honesty or integrity."

Dr. Blakeslee, a psychologist who evaluated applicant at the board's request, submitted a report and also testified. Blakeslee had met with applicant for five sessions, had applicant complete two psychological evaluations, and watched applicant testify. Blakeslee concluded that applicant genuinely had reformed and offered the opinion, when asked, that applicant presently possessed the moral character and fitness to be a lawyer. Blakeslee explained,

"changing his life as [applicant] has is tremendously difficult and cannot be sustained for as long as it has without significant changes in behavior, attitudes and personality structure. It appears that these changes have genuinely occurred based upon all the data provided."

Blakeslee also stated that applicant held himself to a high moral standard and, since being released from prison, had acted in accordance with that standard.

Blakeslee found that applicant did not suffer any addiction to illegal drugs or alcohol that would compromise his abilities as a lawyer. Although applicant was at a higher risk for drug activity than the general population because of his past, the likelihood of a relapse was marginal based on applicant's "stable, prolonged period of sobriety," his "stable,

advancing employment," and his "stable and rewarding marriage."

Following the hearing, the board concluded that RFA 3.10 prohibited applicant's admission and that applicant did not possess the requisite character and fitness for admission to practice law. In October 2004, the board recommended that this court deny applicant admission to the Bar. Applicant petitioned for review.

On review, the board argues initially that RFA 3.10 precludes applicant from admission to the Bar.[3] The board recognizes that this court waived that rule in its November 2002 order. However, focusing on the part of the order that states, "[RFA] 3.10 is waived to the extent that [applicant] shall be permitted to apply for admission," the board argues that the order did not waive RFA 3.10 in its entirety but waived only the part of the rule that prohibited applicant from even applying for admission. The board reasons that the remainder of RFA 3.10 still applies and that the board's only task on remand was to evaluate whether, if applicant had been a lawyer at the time of his conviction, he would have been disbarred.

The board's interpretation overlooks the fact that applicant did not argue only that he was entitled to a hearing when he asked the court to waive the rule. He also argued that the criteria within the rule were ill-suited or inapplicable to nonlawyers and inconsistent with ORS 9.220. Consistently with those arguments, this court's order included the following sentence: "Further, [applicant's] application is remanded to the Board of Bar Examiners for a character and fitness hearing."

The phrase "character and fitness hearing" has a well established meaning. The Rules for Admission describe a "character and fitness" hearing as follows:

---

[3] As noted, RFA 3.10 provided:

"An applicant shall not be eligible to apply for admission to the Bar after having been convicted of a crime, the commission of which would have led to disbarment in all the circumstances present, had the person been an Oregon attorney at the time of conviction."

"(2)   Purpose. The hearing panel, in its character review proceeding, shall inquire into whether an applicant possesses the requisite character and fitness to practice law in Oregon.

"(3)   Definition. 'Character and fitness', as used in these rules, shall mean the 'good moral character' and fitness required to practice law in Oregon pursuant to ORS 9.220(2) and these Rules."[4]

RFA 9.10. As this court's order makes clear, the court did not merely direct the board to hold a hearing on remand. Rather, because the court was satisfied that applicant had made a substantial preliminary showing that he had reformed, the court waived RFA 3.10 and directed the board to apply the standards stated in ORS 9.220(2) to determine whether applicant presently possesses the good moral character and fitness required to practice law in Oregon. We turn to that inquiry.

■       An applicant for admission to the Bar must show that he or she is "a person of good moral character and fit to practice law." ORS 9.220(2)(a). Applicant's past actions are relevant to his present character and fitness, *In re Fine*, 303 Or 314, 322, 736 P2d 183 (1987), and we recognize, as RFA 3.10 does, that some prior criminal actions may be so severe that they would disqualify an applicant from admission. In this case, however, applicant's past criminal acts arose out of and were a consequence of a dependency on controlled substances beginning in childhood and lasting into early adulthood. We do not condone or minimize his actions, but we also cannot overlook the fact, as the board's psychologist observed, that his criminal acts do not reflect any "sort of sociopathy or antisocial behavior." Rather, they reflect a dependency on controlled substances that, by all accounts, is in complete remission.

---

[4] ORS 9.220(2)(b) provides, in part:

"the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."

■ ■     We accordingly proceed to the question whether applicant has reformed. *See In re Covington*, 334 Or 376, 382, 50 P3d 233 (2002) (stating proposition). Applicant bears the burden of proving by clear and convincing evidence that he has done so, *id.*, and any significant doubt about an applicant's character and fitness should be resolved in favor of protecting the public. *In re Jaffee*, 319 Or 172, 177, 874 P2d 1299 (1994). Although reformation is difficult to prove, it can be proved to this court's satisfaction. *See, e.g., In re Rowell*, 305 Or 584, 754 P2d 905 (1988) (demonstrating proposition).

On that point, the board acknowledges that applicant has provided "an impressive array of evidence and recommendations indicating that he presently is a productive member of society and a valued employee of Columbia." The board accurately summarizes some of that evidence:

> "[Applicant] has reconciled with his parents and has started a family of his own. He has diligently educated himself, beginning in prison and continuing with further education while working full-time. He passed the certified public accountant examination and received certification by that body. He has involved himself with the National Crime Victim's Law Institute, where he currently serves on the board of directors. At the time of the hearing in this matter, he was also seeking a position on the board of a youth philharmonic organization."

The board also acknowledges that the people who have worked with and know applicant recognize that he has turned his life around. As the board recognizes, people whose experience and judgment command respect strongly endorse and support his admission to the Bar.

The board does not contend that applicant has a present problem with drug addiction. The board recognizes that applicant has not used illegal drugs since his 1992 arrest, and the board's own psychologist, Blakeslee, has concluded that applicant's dependence on drugs and alcohol is in "sustained full remission—a condition that he described as "fairly remarkable." If the condition that gave rise to applicant's earlier criminal behavior is in "sustained full remission" and if applicant truly has turned his life around, what basis is there for saying that he has not reformed?

The board identifies primarily three factors that continue to cause it concern. It notes that, because applicant has not undergone formal treatment for his drug dependence, it lacks confidence that his recovery is complete. Blakeslee explained, however, that people change their behavior for different reasons. He identified the basis for applicant's change and explained why he had confidence that the change was a durable one. We have no basis on this record for questioning that conclusion.

The board also questions whether applicant's occasional alcohol consumption may be a problem. In the last 12 years, the only instance in which plaintiff's use of alcohol has presented any problem is the incident at the Portland Waterfront. The board's psychologist knew about the Portland Waterfront incident when he concluded that applicant did not have an alcohol addiction or a problem that would call his fitness to practice law into question. We accept his professional opinion. *Cf. In re Rowell*, 305 Or at 589 (holding, on facts of that case, that applicant's continued use of alcohol did not establish present problem).

■ The board's only remaining challenge to applicant's present character and fitness is its claim that applicant has demonstrated a lack of candor about his past in applying for jobs and for admission to the Bar. The board asserts that applicant failed to be forthcoming when he applied for work with his employers and with Columbia in particular. We do not attribute the same significance to applicant's conduct as the board does.

Applicant admits that he should have included his shoplifting conviction on his Columbia application when asked if he had been convicted of a crime of dishonesty, and we agree. *See State v. Gallant*, 307 Or 152, 157, 764 P2d 920 (1988) (shoplifting is crime of dishonesty for purposes of impeachment under OEC 609). However, applicant went a long way toward ameliorating that omission in his later discussions with Columbia personnel. We also note, with some interest, that a Columbia executive testified that, in his view, applicant had answered the question truthfully. In sum, we do not find this incident to be disqualifying.

■ The board also asserts that applicant was not completely forthright with the board, particularly on his bar

application. The board asserts that applicant provided false or incomplete answers when asked whether he had ever been denied a bond, undergone in-patient substance abuse treatment, or been known by another name, and when asked to list his previous five employers.

Applicant, however, correctly answered "no" to the question whether he had ever been denied a bond. Applicant had never applied for a bond, nor had Smith Barney ever applied for a bond on applicant's behalf. Applicant could have gone beyond the question the board asked, but the manner in which he chose to answer it was not untruthful either by affirmative statement or by omission.

We also find that that applicant did not provide false information by stating that he had undergone in-house drug treatment when he had attended but had not completed that treatment. The question that the board asked was whether applicant had "ever had a dependency upon, undergone treatment for, or been discharged from employment for the use of a controlled substance or alcohol." Applicant checked "yes" and disclosed that he had had a drug addiction in the past and also had undergone in-house drug treatment. The point of the question was to inquire, in three different ways, whether applicant had a dependency on alcohol or controlled substances. By stating that he had had a drug addiction in the past and that he had undergone in-house drug treatment, applicant accurately disclosed that he had had a problem.

The board also notes that applicant did not respond accurately when asked "[have you] ever been known by any other name." He did not disclose that he had given a false name to police officers in his youth. As the phrase "known by" suggests, the point of the question is to provide the board with alternative names to include in researching an applicant's past, not to determine whether an applicant has ever used a false name. Although disclosing his use of a false name in response to the question would have been prudent, we do not find the omission as significant as the board does.

The board also notes that applicant had failed to list two of his former employers. Applicant explained that he had not listed Bardsley & Neidhart and Smith Barney because he had been at each company for a short period of time and also because applicant was not sure he had ever been employed by

Smith Barney. Although applicant may have been less than thorough in not including the two companies, there is no indication that he was attempting to hide information from the board. Without minimizing the board's concerns about candor, we are satisfied that applicant disclosed every relevant fact to the board and did not try to hamper the board's review in any way. Indeed, the board conceded that it did not uncover any evidence that reflected poorly on applicant's character beyond the facts that applicant told them.

Finally, the board focuses on selected parts of Blakeslee's testimony to support its assertion that applicant has a tendency not to be candid. The board takes Blakeslee's testimony out of context. It is true that, when questioned about what the board characterizes as applicant's omissions on his bar application and lack of candor with his employers, Blakeslee stated that applicant had a tendency to "shad[e] information in a way that benefits him." Blakeslee noted, however, that applicant had not manifested any tendency to manipulate information at work. As Blakeslee explained, "[u]nder a tremendous amount of stress [applicant is] able to maintain his moral character to a sufficient degree." Fairly read, Blakeslee's testimony does not support the board's position; it cuts against it.

Viewing the record as a whole, we are convinced that applicant has reformed. A significant amount of time has passed since the conduct in question. *See Rowell*, 305 Or at 591-92 (recognizing significance of time). Applicant has not engaged in any criminal activities, including illegal drug use, in the past 12 years. Also, as Blakeslee testified, applicant has accepted responsibility for his actions. *See id.* at 591 (recognizing significance of accepting responsibility). Balancing a very full life, applicant has been remarkably successful in achieving his personal, professional, and educational goals. *See id.* at 592 (recognizing significance of such achievements). In addition to his activities that benefit him personally, applicant has been serving on the board of a nonprofit organization and is in the process of joining another. *See id.* at 591 (recognizing significance of participating in activities for the public good). Finally, applicant's references are impressive and include many members of the Bar who are aware of applicant's past and are sensitive to the board's considerations. Three of applicant's references knew him when

he was involved with drug use and other criminal activity. *See id.* at 590 (recognizing that statements from persons who knew an applicant now as well as during earlier, troubled days have particular significance). In sum, we are satisfied that applicant currently possesses the requisite good moral character and fitness to practice law.

Applicant's application for admission to the Oregon State Bar is allowed.