Submitted on the briefs May 19, applicant conditionally admitted to practice of law December 24, 2020

In the Matter of the Application for Admission of:
NEIL PATRICK HALTTUNEN,
*Applicant.*
(BBX A172051) (SC S067161)

478 P3d 488

Applicant admitted that, from 2009 to 2012, he inappropriately had used the position of trust and authority that he possessed as a police officer to pursue romantic and sexual relationships with vulnerable women whom he encountered while performing his official duties. He also admitted that he was dishonest with his employer about that conduct during an internal investigation. After his departure from the police department, applicant underwent therapy, through which he gained insight into his past behaviors and their impact on others and developed the tools and support network to maintain a successful reformation. None of the psychological experts who treated or evaluated applicant believed that he suffers from the kind of fundamental and pervasive personality challenge that might prevent a successful rehabilitation of his behavior and character. His application to the Bar was supported by numerous character references, including many members of the Bar. *Held*: (1) Applicant's misconduct was not so egregious to preclude applicant from admission to the Bar without considering the steps that he has taken since 2012 to rehabilitate his character; and (2) applicant demonstrated genuine self-improvement and rehabilitation since his misconduct to justify conditional admission to the Bar.

Applicant is conditionally admitted to the practice of law.

On review of the recommendation of the Board of Bar Examiners.

David J. Elkanich, Holland & Knight LLP, Portland, filed the briefs for applicant. Also on the briefs was Nellie Q. Barnard.

Theodore W. Reuter, Assistant Disciplinary Counsel, Tigard, filed the answering brief on behalf of the Oregon State Bar. Susan R. Cournoyer, Assistant Disciplinary Counsel, filed the supplemental brief.

PER CURIAM

Applicant is conditionally admitted to the practice of law.

## PER CURIAM

In this contested lawyer admission proceeding, the issue is whether applicant Neil Halttunen has proved by clear and convincing evidence that he possesses the good moral character necessary for admission to the Oregon State Bar. A majority of the Board of Bar Examiners (board) issued an opinion recommending that the court deny admission; a minority opinion recommended conditional admission. There is no dispute that, from 2009 to 2012, while working as a police officer, applicant engaged in inappropriate, unethical, and dishonest conduct that raises significant questions about his moral character. Applicant admits that he inappropriately used the position of trust and authority that he possessed as a police officer to pursue romantic and sexual relationships with vulnerable women whom he encountered while performing his official duties. He also admits that he was dishonest with his employer about that conduct during an internal investigation. Applicant contends, however, that he has demonstrated sufficient reformation since leaving the police department to establish his current fitness to practice law. We are persuaded, and we conditionally admit applicant to the practice of law in Oregon.

## I.   INTRODUCTION AND LEGAL STANDARD

To be admitted to practice law in this state, an applicant must prove "by clear and convincing evidence that he or she is of good moral character and is fit to practice law." *In re Zielinski*, 341 Or 559, 561, 146 P3d 323 (2006) (stating standard); *see* ORS 9.220(2)(a) (establishing "good moral character and fit to practice law" standard); Rule for Admission of Attorneys (RFA) 9.45(6) (in character review proceeding, applicant must establish by clear and convincing evidence the requisite character and fitness to practice law). "Stated differently, applicant must show that it is 'highly probable' that [applicant] has the good moral character and fitness to practice law." *In re Covington*, 334 Or 376, 382, 50 P3d 233 (2002).

An applicant may be unable to establish "good moral character" if the applicant has engaged in "acts or conduct that reflect moral turpitude or *** [that] would cause a reasonable person to have substantial doubts about the

individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation," if those acts or conduct are "rationally connected to the applicant's fitness to practice law." ORS 9.220(2)(b); *see also In re Carter*, 334 Or 388, 394, 49 P3d 792 (2002) (describing the statutory standard). But it is not impossible for such an applicant to demonstrate sufficient reformation of character to establish that he or she *presently* has the good moral character and fitness to practice law. *See, e.g.*, *id.* at 394-95 (when considering the character of an applicant who had engaged in "misconduct involving moral turpitude," describing the "crucial inquiry" as whether the applicant had demonstrated that his "character has reformed sufficiently in the interim to permit his admission to the Bar").

This court has charged the board with investigating and evaluating an applicant's character and fitness. *See* RFA 2.10(2) (board shall investigate and evaluate moral character and fitness to practice law of each applicant); RFA 6.05 (board has authority to conduct investigations, convene evidentiary hearings, and issue subpoenas). The board did that in this case by reviewing an extensive documentary record, interviewing applicant, appointing a special investigator, and conducting an evidentiary hearing that included the examination of 25 witnesses. Although the board has recommended a disposition, this court reviews the record *de novo* to determine whether applicant has shown that he is a person of good moral character. *See* ORS 9.536(2); ORS 9.539; Bar Rule of Procedure (BR) 10.6; RFA 9.60(5).

## II.   THE CHARACTER-REVIEW RECORD

A.  *Prior Misconduct*

After graduating from high school and serving for a few years in the Army as a military police officer, applicant moved to Oregon in 1993 to begin a career in law enforcement. He worked first as a corrections officer in Lane County and then as a police officer in Roseburg, finally taking a job as a police officer with the Springfield Police Department, where he worked from 1996 to 2012. During his time at the Springfield Police Department, applicant was twice married and divorced.

Applicant's pattern of misconduct began in 2009, while he was still a police officer at the Springfield Police Department and was married to his second wife. Applicant first pursued a woman whom he had originally encountered when he arrested her on a warrant in 2008. He encountered the woman again in 2009 when investigating a police report that she had made, and he used the woman's interest in the status of that investigation to initiate a personal relationship. Applicant began calling the woman, texting with her, and dropping by her house in his patrol car to chat. He made it known to the woman that he was unhappy in his marriage and wished to have a relationship with her. Those contacts ultimately led to a sexual relationship that began in approximately 2010.

Between that 2009 incident and the end of 2012, applicant pursued numerous other women that he met in the course of his duties, many of whom had criminal records. According to applicant, that conduct resulted in several other sexual relationships and contributed to the end of his second marriage. In addition, applicant estimated that there were eight to 12 other women, whom he also met while performing his official duties, with whom he engaged in inappropriate sexual communications—usually through text messages.

The record is not clear as to the manner in which applicant met and pursued each of those women, but the circumstances for some are similar to those under which he met and pursued the first woman. For example, applicant met one woman when he responded to a car accident and gave her a ride home. He met her again when he responded to a disorderly conduct report at her apartment complex and then showed up at her apartment a week or two later, supposedly to check if she had experienced additional problems but then shifting the discussion to personal matters. The two began a relationship over text messages that eventually became sexual. Applicant met another woman when he responded to a disorderly person complaint near the bar where she worked and then met her again when he responded to a theft that occurred at the bar. After obtaining the woman's personal information for purposes of completing his report, applicant called the woman on her personal phone,

and the two began a relationship that included texting and conversation—while applicant was on duty—and at least some sexual contact while he was not on duty.

Although those women described their relationships with applicant as consensual, applicant has admitted that he knew at the time the relationships were unethical, and he has acknowledged that his conduct undermined the credibility of the police department and reflects poor moral character. Moreover, the record makes plain that applicant inappropriately pursued other women who felt that applicant was taking advantage of their vulnerability and the power that he wielded over them as a police officer. For example, applicant twice attempted to pursue an intimate relationship with women whom he met in the course of arresting their boyfriend or husband. He called one of the women from his personal phone less than an hour after advising her that her boyfriend would be spending the night in jail and pressured her into accepting a ride from him, began caressing her arm, and suggested that they find a dark place to park. Both women let applicant know that the contact was unwelcome, and he did not persist, but the women reported that they had felt vulnerable to and intimidated by applicant's inappropriate contact.

Another woman was the manager of an exotic dance club that applicant regularly patrolled when he worked in the evenings. Applicant frequently tried to engage her in conversation when he saw her in the parking lot. Applicant texted her on numerous occasions when the woman understood him to be on duty, sending and asking for sexually suggestive photos as well as sending at least one sexually explicit video. The woman testified that applicant's advances were unwelcome and felt "stalker-ish" but that applicant was "the man in charge" (as a police officer), so the woman responded enough "to keep him happy a little bit."

Applicant's unwelcome contacts led to a complaint to the Springfield Police Department in November 2012. That complaint triggered an internal investigation led by Sgt. Rappe, who interviewed applicant and several witnesses. Although applicant now admits to all of the inappropriate contact described above, he displayed a lack of candor

during the 2012 investigation. He acknowledged pursuing or engaging in sexual contact with several women, including two of whom the department had not yet been aware, but he admittedly did not disclose other inappropriate sexual encounters with women whom he met through his official duties.

Applicant resigned from the police department before Rappe completed his investigation, and the department closed its investigation. Soon after applicant's resignation, the Oregon Department of Public Safety Standards and Training (DPSST), which trains and certifies public safety officers, opened its own investigation into applicant. DPSST staff reviewed materials provided by the Springfield Police Department, concluded that applicant's conduct violated the moral fitness standards, and referred the case for further administrative review to decide whether to revoke applicant's DPSST certifications. However, applicant agreed to bring an end to the inquiry by stipulating that he would voluntarily relinquish his DPSST certifications and that the revocation would be permanent, thus precluding applicant from future work as a public safety officer in Oregon.

Applicant admits all of the above misconduct. The only allegations that he denies were made by JF, who had been an exotic dancer at a club in Springfield when applicant arrested her for driving under the influence of intoxicants (DUII) in 2009. Because JF's allegations—and applicant's denial of them—were critical to the board's conclusion, we discuss those allegations in detail. It is undisputed that applicant was dispatched to the club where JF worked to investigate a report of erratic driving made by a citizen who followed JF's car to the club. At the club, applicant first spoke with the bartender, who described JF as intoxicated when she arrived, and then asked JF to perform field sobriety tests before arresting her. At the police station, JF submitted to a breathalyzer test that revealed a 0.18 blood alcohol content. She claimed—at least later—that she began drinking only after she had arrived at the club.

JF was not a witness at the hearing, but her statements to other witnesses are part of the record. JF's concerns about applicant were first reported in detail to the

Springfield Police Department when Rappe interviewed her in 2012 in the presence of her attorney.[1] JF told Rappe that, during the 2009 arrest, applicant had been overly friendly with her at the jail and had insisted that she needed to remove all of her jewelry in his presence, even after she explained that her jewelry included a genital piercing. She explained that she had been "creeped" out by applicant's behavior and insisted on the presence of a female deputy before she removed the piercing.

JF also complained to Rappe that applicant seemingly pursued her after the arrest. JF reported learning that, shortly after her arrest, applicant had encountered JF's older sister at one of his son's baseball games and had told the sister that he was keeping an eye on JF and that she was being a "good girl." She also reported that applicant began showing up at the club while he was on duty, mostly just driving though the parking lot but sometimes walking inside, and that he appeared to be staring at her or attempting to talk to her. JF described that attention as continuing even after she started working at a different club. She explained that applicant's attention made her feel uneasy and frightened because "cops are powerful."

JF was interviewed about applicant again in 2017, this time over the phone by another Springfield officer. JF largely repeated what she had told Rappe,[2] but she also described more extensive misconduct, including that applicant had visited her club on a daily basis, often trying to talk with her, beginning months prior to her 2009

---

[1] Shortly after her DUII arrest, JF made at least one informal complaint to another officer about an unwanted contact by applicant following that arrest, and she reported in later interviews that she had fully described applicant's arrest behavior to the lawyer who had represented her on the DUII charge in 2009, whom she thought had used that information to obtain what she understood to be a favorable disposition of the charge.

[2] The board describes JF as stating in the 2017 interview that, at the time of her arrest, applicant had taken her to a room at the station "where Applicant forced her to undress." But that understanding of the record appears to be incorrect. JF did not report in either interview that applicant had forced her to undress in his presence. To the contrary, she told the interviewer in 2017 that she "did not recall that she actually removed the jewelry," and Rappe recorded JF as stating only that applicant had been "overly pushy" but that "[s]he demanded to have a female deputy present because she wasn't going to take [her piercing] out unless one was present."

DUII arrest. First, JF suggested to the interviewing officer that her DUII arrest had been improper. She claimed that she had failed the field sobriety tests because applicant had required her to perform the test in the eight-inch heels that she wore for dancing; further claimed that she had consumed a significant amount of alcohol after arriving at the club; and "implied," according to the interviewer, that she had not consumed any alcohol prior to driving, although "she acknowledged her driving may have been poor." JF also added in that 2017 interview that applicant had behaved inappropriately before taking her into the police station, following her arrest. She reported that applicant had picked her up and sat her on the trunk of his car to let her smoke, in what the interviewer's report characterized as an "awkward, sexually-oriented, and inappropriate" maneuver, and JF reported that applicant had been "attempting to imply there was some way out of her predicament by favor."

Applicant denies JF's allegations of inappropriate conduct. He contends that he had no contact with JF before he arrested her in 2009 and that the arrest was entirely proper. He points out that he was following up on the citizen's report of erratic driving and that the bartender at the club had described JF as intoxicated when she arrived. Applicant denies the allegation that he required JF to perform field sobriety tests in heels and emphasizes both that the arrest report showed that she performed the tests in boots and that the chief of police had observed the tests after stopping by to serve as backup. He also pointed to inconsistencies between JF's timeline of events and contemporaneous records that were either automatically time-stamped or not created by applicant—at least one of which is also noted in the 2017 investigative report. Applicant emphatically denies that he asked JF to remove a genital piercing in front of him or that he had any inappropriate contact with her prior to taking her into the police station.

With respect to the allegation that he pursued JF after the arrest, applicant testified that he "certainly was driving through the parking lot [of the club] several times a week, if not daily" during his patrols—the club was nearly across the street from the police station—but he denied intentionally targeting JF and testified that he could only remember

two occasions when he interacted with JF after the arrest. He explained his conversation with JF's sister at their children's baseball game as an effort to mitigate any awkwardness resulting from the fact that he had recently arrested JF. In his briefing to this court, applicant suggests that JF's description of applicant's conduct in the 2012 interview with Rappe may have been influenced by a recent charge of felony resisting arrest in relation to a 2012 DUII. As a defense to the resisting arrest charge, JF had asserted that her conduct was "something of a post-traumatic stress reaction to the police," resulting from applicant's alleged misconduct.

### B.   *Efforts at Reformation*

Applicant reports that the months following his resignation were a low point in his life. In August 2013, applicant began psychotherapy with Dr. McDonald. At the time, applicant felt that he had been treated unfairly because he believed that others in the police department engaged in misconduct that went unpunished. But applicant's therapy sessions forced him to confront the fact that his life circumstances were a result of his own selfish and immature conduct. According to Dr. McDonald, applicant "demonstrated both the willingness and the ability to engage in critical self-analysis and insight into his behavior and its impact on others." Dr. McDonald saw applicant for about 10 months and concluded that he "took his therapy seriously and displayed the courage to examine his choices, thinking patterns, and behavior."

Those thinking patterns had included chauvinistic views and objectification of women. As a police officer, he was known to make crude comments about sex, and he admits that, at the time, he viewed sex as an opportunity to prove himself. Further, applicant was unfaithful in both marriages during his time as a police officer.

Those thinking patterns had also included an unwillingness to admit vulnerability. Although applicant initially had found work in law enforcement rewarding, it took a toll on him emotionally. Specifically, applicant struggled handling his encounters with death while on the job, which had increased after he began work as a drug recognition expert and after he began being regularly dispatched to

fatal car accidents. Despite feeling worn down by the work, applicant did not seek help while he worked at the department, even though mental health services were available to officers in need, because he did not want to be perceived as weak.

According to applicant, his own harmful patterns of thinking were prevalent and promoted at the department. His therapy following the resignation allowed him to view his misconduct as a combination of his unhealthy views about sex and his emotional stress. As he testified during the hearing, "I was more worried about making myself feel good and not paying attention to the rules or to their emotions. And so I sought that out to kind of feel good about myself[.]"

During his treatment with Dr. McDonald, applicant developed new personal and professional goals. He knew another former officer from the Springfield Police Department who had started law school and turned his life around after being similarly worn down by work as a police officer. Applicant applied to, and was accepted into, Willamette University College of Law to start in the fall of 2014.

Applicant moved to Salem to begin classes at Willamette. He did well in law school and developed an interest in criminal law. He also began dating a woman whom he would later marry. Following his first year of law school, applicant worked in the financial fraud section of the Oregon Department of Justice and, in his second year, began working as a law student at Vidrio Park & Jarvis, LLC, with a focus on criminal defense. Applicant volunteered as a mentor to new students and won a pro bono award for his work on behalf of a disabled veteran through the Willamette Law Pro Bono Honors program. In his third year of law school, applicant continued to work at Vidrio Park & Jarvis, LLC, now as a certified law student, which allowed him to represent indigent clients facing criminal misdemeanor charges. That work included trying eight cases to a jury. The members of the firm were impressed with his work and indicated a desire to hire him to a full-time position when he became a member of the Bar.

Applicant knew that, in light of his history with the Springfield Police Department, his character and fitness to practice law would be scrutinized by the board. As a result, when entering his third year of law school, applicant contacted a counselor from the Oregon Attorney Assistance Program, who recommended that applicant participate in additional psychotherapy. Applicant followed that recommendation and saw Dr. Miller-Moe from September 2016 through April 2017. According to Dr. Miller-Moe, applicant had "used the psychotherapy to explore the impact of work culture and the extraordinary stress related to work in law enforcement," and had "developed a variety of tools to maintain physical and mental health." In Dr. Miller-Moe's opinion, applicant did "not present with any mental or emotional barriers which would impair his ability to practice within the ethical guidelines of his chosen profession."

Applicant submitted his application to the Bar in March 2017. Applicant then graduated from law school in May 2017 and passed the July 2017 Bar exam. At about the same time, he participated in a psychosexual evaluation conducted by Dr. Linn, hoping to establish that he had no personality traits that posed a risk of repeating his misconduct while a police officer. Dr. Linn reviewed all of the reports about applicant from the Springfield Police Department, the DPSST investigations, and a recording of applicant's interview with the three-member board panel. Dr. Linn opined that applicant's "psychiatric history, attitudes, and psychological testing do not reflect the existence of a personality disorder" and rejected a suggestion that applicant suffered from a "narcissistic personality disorder." Rather, according to Dr. Linn, applicant "appears capable of empathy and insight into his deficits."

Dr. Linn's report described applicant's sense of shame and guilt for his misconduct. In the report, applicant is quoted as acknowledging the power imbalance between himself and the women he met in the course of his duties: "'I was working as a police officer and they see me as an authority figure. I didn't factor that power differential in or how they may be perceiving the situation.'" When Dr. Linn asked applicant whether he believes that he had been taking advantage of the women he met, applicant stated, "'Yes,

but at the time, I didn't see it that way. I just saw it as consensual. With benefit of hindsight [these women] have been more vulnerable. I should have paused to see that.'" Similarly, applicant stated, "'I thought it was mutual attraction. I didn't pause long enough to think that they weren't talking to Neil but possibly a police officer.'" In his interview with Dr. Linn, applicant acknowledged that there are also power differentials between a lawyer and client. But he said, "Having gone through that experience of letting people down and shaming myself, I looked in the mirror[,] how I was, and I don't want to be that person anymore. I don't view women or sex in the same way that I used to."

Dr. Linn concluded that applicant's prior misconduct "appear[s] related to a complicated variety of environmental factors, untreated trauma, alcohol abuse, marital stress, and unhealthy messages regarding women and sexuality through his experience as a soldier and police officer." And Dr. Linn noted that applicant's various experiences with counseling and psychotherapy "suggest a well above average level of commitment to personal growth and relapse prevention." Nevertheless, based on applicant's previous "pattern of acting-out behavior," Dr. Linn recommended a conditional admission for a term, during which applicant would continue psychotherapy to further "develop relapse prevention strategies and healthy boundaries in his future work with potentially vulnerable clients."

As part of that evaluation, Dr. Linn referred applicant for sessions of professional boundary counseling with Dr. Shallcross, which applicant attended in 2017. According to Dr. Shallcross, applicant "had gained tremendous insight into his behavior," and his current life circumstances created a "much different environment" than that out of which his misconduct arose. Dr. Shallcross had no concerns about applicant's ability to conduct himself "professionally" in the practice of law.

C.   *Conduct During Application Process*

As described above applicant submitted his application to the Bar in March 2017. In the application, he acknowledged that he had resigned from the Springfield Police Department while under investigation for his relationships

with women whom he met while on duty. He also acknowledged that, while under investigation by the department, he had not fully disclosed the extent of those relationships. He stated, however, that "[t]hese relationships were consensual and they did not affect any enforcement or investigative decisions I made as part of my duties." The application went on to describe the steps that applicant had taken since leaving the police force to improve himself and avoid similar conduct in the future, including his therapy and new life circumstances, and highlighted his work at Vidrio Park & Jarvis, LLC.

A panel of three board members scheduled an interview with applicant at the end of October 2017. Before the interview, applicant provided the board with personal and professional letters of recommendation and documentation from mental health professionals, attesting to applicant's fitness to practice law. That included Dr. Linn's report and letters from Dr. McDonald, Dr. Miller-Moe, and Dr. Shallcross, all of whom supported applicant's admission to the Bar.

During the interview, applicant repeated many of the themes that appeared in Dr. Linn's report—namely, that he "didn't pause to really think about the power dynamic" between him and the women he met while a police officer; that he knew that his behavior was wrong at the time, but rationalized it because it made him feel better; that therapy helped him reflect on his actions and how they affected others, including the women he met and his family; and that he deeply regretted his conduct.

However, one aspect of applicant's responses during the interview caused the board to doubt applicant's veracity. During the panel interview, applicant was asked whether he had sexual contact with any other women he met in the course of his duties beyond those identified in the reports that were prepared by Rappe during the course of the Springfield Police Department's 2012 investigation. Applicant replied that there were other women with whom he had had "sexual communications," but that the reports identified all the women with whom he had had sexual contact. A few days after the interview, however, applicant sent an email to the panel acknowledging that he actually had

had sexual contact with two additional women whom he had met through his official duties and who were not identified in Rappe's reports. Applicant provided the women's names and basic details of those encounters.

Following the panel interview, the board voted to deny applicant admission to the Bar, and he requested a formal hearing. At the hearing, applicant again testified along the same lines as his earlier interviews with Dr. Linn and the board panel. He added that his time representing criminal defendants as a certified law student had deepened his understanding of the vulnerable position of many of the women whom he had met:

> "I represented a lot of clients, including women. And I can remember having conversations with them, preparing for their defense. And they were the kind of conversations I never would have had as a police officer and they were telling me some of the background that led up to why they were being represented. And I remember thinking these are the same kind of issues that the women I had affairs with were probably experiencing. *** I did not feel good about myself when I, when it dawned on me like that."

He then tied that vulnerability to understanding how his conduct was an abuse of power:

> "I feel like it took advantage of the situation that I was in because *** I didn't stop and think at the time about what was going on in their lives, what their emotional needs were, what they were thinking. I was thinking about myself. And that abused the power because I was in a position of trust that they relied on and then I took advantage of it and wound up in relationships with them."

One incident following the evidentiary hearing had a significant influence on the board's ultimate decision. The board had left the record open for limited purposes, which included allowing its special investigator to contact relevant individuals named in the proceedings and allowing applicant to submit declarations from character references who had been unable to testify. Before the record closed, applicant spoke with a Springfield police officer, Detective Weaver, who had testified at the hearing for applicant. The two discussed hearing testimony given by Rappe,

in particular the effort by applicant's counsel to impeach Rappe by asking about complaints of sexual and other misconduct against Rappe over the years.[3] Rappe maintained that the only recent complaint was no longer being pursued against him, and Weaver thought that Rappe's statement was inaccurate. Applicant provided Weaver with a video recording of the hearing, from which Weaver extracted only Rappe's testimony and shared it with the Springfield Police Association, in order to determine whether Rappe had testified falsely. The police association showed the video clip to the Springfield chief of police, who advised that Rappe had accurately described the status of the complaint about his conduct. The board viewed applicant's actions as an effort to retaliate against Rappe by giving the police association ammunition for an ongoing battle with Rappe.

## III.   DISCUSSION

Based on that record, a majority of the board recommended against admission, concluding that applicant had failed to accept responsibility for his misconduct as a police officer and lacked candor throughout the application process. Three dissenting board members, however, recommended conditional admission. They concluded that applicant had accepted responsibility for his actions, that his misconduct was not the product of a "fundamental, enduring, and pervasive aspect of his personality," that his character references demonstrated that he has made significant behavioral and attitudinal change, and that applicant was genuine in describing his understanding of, and remorse for, how his conduct harmed the women he pursued.

As noted above, we review the record *de novo* to determine whether applicant has shown that he is a person of good moral character. *See* ORS 9.536(2); ORS 9.539; BR 10.6; RFA 9.60(5). There is no doubt that applicant's conduct while working as a police officer provides a basis for questioning whether he possesses the good moral character that is required to practice law. As applicant acknowledges, his

---

[3] During his hearing testimony, Rappe had disagreed with applicant's testimony that harmful patterns of thinking were prevalent and promoted at the department, so evidence that Rappe himself was the subject of misconduct complaints could have undermined that testimony.

conduct was inappropriate, unethical, and even potentially criminal.[4] There also is no question that applicant's abuse of his power and position as a law enforcement officer caused emotional harm to some of the vulnerable women whom he pursued. Moreover, applicant admittedly responded dishonestly during the 2012 investigation into his misconduct. The crucial inquiry in this case is whether applicant has demonstrated that, despite his history, he now possesses the character and fitness to permit his admission to the bar because his "character has reformed sufficiently in the interim." *Carter*, 334 Or at 395; *id.* at 394-95 (so describing the "crucial inquiry" when considering the character of applicant who had engaged in "misconduct involving moral turpitude").

Applicant urges this court to adopt the recommendation of the board minority and conditionally admit him to practice law. He argues that he "has completely and totally overhauled his life" and that he has demonstrated by clear and convincing evidence that he has been successful in his efforts at reformation and presently possesses the good moral character and fitness that is required for admission to the Bar. He emphasizes in particular that 20 members of the Bar, including a retired former chief justice of this court, have attested to his present character and fitness to practice law. The board, on the other hand, urges this court to adopt the carefully considered reasoning of the majority and to deny applicant admission to the Bar, either because his prior misconduct is so significant that his evidence of reformation is irrelevant or because petitioner's words and conduct throughout the course of the admission process undermine his evidence of reformation.

As the split decision of the board reflects, this is a close question. This court has repeatedly emphasized that "'[r]eformation is a very difficult matter for a petitioner to prove and for [this court] to judge.'" *In re Jaffee*, 319 Or 172, 177, 874 P2d 1299 (1994) (insertions in original; quoting *In re Bernard Jolles*, 235 Or 262, 275, 383 P2d 388 (1963)).

---

[4] There was testimony at the hearing that applicant's conduct satisfied the elements of Official Misconduct, which is a Class A misdemeanor. ORS 162.415. And applicant does not dispute the characterization of his conduct as criminal.

Nevertheless, "reformation *can* be proved to this court's satisfaction, as this court's past decisions attest." *Id.* (emphasis in original). And we are satisfied in this case that applicant has demonstrated reformation sufficiently to qualify for conditional admission to the Oregon State Bar.

A.  *Whether Applicant Should Be Categorically Barred from Admission*

Before turning to the evidence of reformation, we briefly address the board's argument that applicant's conduct should categorically bar him from admission, regardless of his evidence of reformation. In support of that argument, the board first urges this court to conclude that the permanent revocation of applicant's DPSST certification is, itself, enough to preclude his admission to the Bar. As the board points out, DPSST certification—like bar admission—requires that a person have "moral fitness." OAR 259-008-0010(6) (2013). The board does not exactly suggest that the DPSST action reflects a finding that should give rise to a form of issue preclusion. It could not, because the DPSST did not revoke applicant's license based on a determination that he lacked moral fitness. Instead, DPSST revoked applicant's license because he relinquished his license while an investigation was in progress. OAR 259-008-0070(9)(k) (2013). Although the board asks this court to view that relinquishment as equivalent to a "Form B" resignation of bar membership, which permanently disqualifies the lawyer from being reinstated, BR 9.4, the board has offered no reason that this court—or applicant in this court—should be bound by the DPSST's revocation decision. Regardless of any similarity between the standards for DPSST certification and membership in the Oregon State Bar, this court has an independent obligation to determine whether an applicant is presently qualified for membership in the Oregon Bar. *See generally In re Sanai*, 360 Or 497, 500, 383 P3d 821 (2016) ("[I]n reciprocal discipline cases, we have an independent obligation to determine an appropriate sanction based upon this state's disciplinary rules.").

The board also argues that applicant's conduct was so egregious that it would result in automatic disbarment if engaged in by a current bar member and, likewise, should

categorically preclude bar membership when engaged in prior to an application for Bar membership. The board first points to RFA 3.10, which provides that "[a]n applicant shall not be eligible for admission to the Bar after having been convicted of a crime, the commission of which would have led to disbarment in all the circumstances present, had the person been an Oregon attorney at the time of conviction." That rule does not directly control this case, however, as the board seemingly recognizes; regardless of whether applicant's conduct could have been prosecuted as a criminal offense, it was not. As a result, applicant has not been convicted of a crime, and RFA 3.10 does not control.

Nor is an analogy to conduct that might result in disbarment dispositive in this case. The nature, extent, and severity of an applicant's prior misconduct is relevant to assessing whether the applicant has the good moral character necessary to practice law. Indeed, "some prior criminal actions may be so severe that they would disqualify an applicant from admission." *In re Beers*, 339 Or 215, 224, 118 P3d 784 (2005). But the misconduct at issue in this case, which was confined to a limited period of applicant's career as a police officer, is not so egregious that we can assess applicant's character without considering the steps that he has taken since 2012 to rehabilitate his character.

B.   *Whether Applicant Has Established His Moral Character*

We therefore proceed to the question of whether applicant has sufficiently reformed his character to warrant admission to the Bar. When an applicant's prior conduct demonstrates a lack of good moral character, the "[a]pplicant bears the burden of proving by clear and convincing evidence that he has [reformed his character], and any significant doubt about an applicant's character and fitness should be resolved in favor of protecting the public." *Id.* at 225 (internal citation omitted). This court has previously considered, "as evidence of reformation, character testimony from those who know and have had an opportunity to observe the applicant, participation in activities that benefit society, and an applicant's forthright acknowledgment of the wrongfulness of his or her past actions." *Carter*, 334 Or at 395.

In *Carter*, this court agreed with the board's concern that an applicant who had previously committed theft—"an act of misconduct involving moral turpitude"—had failed to prove reformation, in part because he had failed to produce "any current personal or professional character evidence" and had failed to follow a psychologist's recommendations for addressing "the underlying psychological reasons for his behavior." *Id.* at 393-94. As we emphasized in that case, the applicant's claim that his actions since the time of the theft showed "good moral character" reduced to "remaining crime-free and pursuing his academic goals of, among other things, completing law school, passing the Oregon Bar Examination, and pursuing an electrical engineering degree," which we concluded was not "any evidence from which this court could conclude that applicant's character has reformed sufficiently to permit his admission to the Bar." *Id.* at 395.

But we reached a different conclusion in *Beers*. The applicant in that case had a long history of using and selling drugs and other associated criminal activity, including weapons offenses and driving under the influence. During that period of his life, he had failed to appear for court hearings on multiple occasions, twice provided police officers with a false name, and once hired someone to impersonate him at a court-ordered drug treatment program. 339 Or at 217-18. By his mid-twenties, the applicant was a mid-level drug dealer, buying and selling large quantities of cocaine. He was arrested, and he served almost three years in prison. *Id.* at 218.

While serving that prison sentence, the applicant "began to turn his life around." *Id.* He had "stopped using drugs, began taking college courses, and dealt with his unresolved criminal charges and warrants." *Id.* He continued his college education after his release from prison and quickly found success in business. By the time that he started law school, the applicant had been out of prison for four or five years and was the Director of Operations for a division of Columbia Sportswear. The applicant had attended law school at night while working full time and raising three children with his wife. During law school, the applicant also had passed the Certified Public Accountant exam, had

received his accounting license, and had begun serving as a member of the board of directors of the National Crime Victims Law Institute. By the time that the applicant graduated from law school and applied for admission to the Bar, he had been out of prison for eight years and drug-free for 10 years. *Id.* at 220.

This court concluded that the applicant had sufficiently reformed to warrant admission to the Bar. *Id.* at 228. The court first characterized the applicant's earlier criminal conduct by noting that it was related to his drug addiction and that he was no longer addicted to drugs. As the court explained, "[i]f the condition that gave rise to applicant's earlier criminal behavior is in 'sustained full remission' and if applicant truly has turned his life around, what basis is there for saying that he has not reformed?" *Id.* at 225.

This court went on to consider the amount of time that had passed since the applicant's misconduct, his acceptance of responsibility for his misconduct, his success in "achieving his personal, professional, and educational goals," his participation in "activities for the public good," and his impressive references, which included many "members of the Bar who are aware of applicant's past and are sensitive to the board's considerations," as well as people who knew the applicant both before and after he turned his life around. *Id.* at 228-29.

In this case, as in *Beers*, applicant has demonstrated a marked degree of self-improvement and rehabilitation since his misconduct. None of the psychological experts who evaluated applicant believed that he suffers from the kind of fundamental and pervasive personality challenge that might prevent a successful rehabilitation of his behavior and character. They opined that he has gained insight into his past behaviors and their impact on others and has developed the tools and support network to maintain a successful reformation. And, like the applicant in *Beers*, applicant has a wide range of references attesting to the fact that he has fundamentally changed his behaviors and reformed his character.

First, as the author of the dissenting board recommendation, Dr. Kolbell, emphasized, the record contains no

evidence that applicant's behavior between 2009 and 2012 was attributable to a personality disorder, severe psychological condition, or other manifestation of an "enduring aspect of his personality or character." At the hearing, Dr. Linn had opined that applicant's "psychiatric history, attitudes, and psychological testing do not reflect the existence of a personality disorder" and that applicant "appears capable of empathy and insight into his deficits." Further, in Dr. Miller-Moe's opinion, applicant had "developed a variety of tools to maintain physical and mental health" and did "not present with any mental or emotional barriers which would impair his ability to practice within the ethical guidelines of his chosen profession." And, according to Dr. Shallcross, applicant "had gained tremendous insight into his behavior," and she had no concerns about his ability to conduct himself "professionally" in the future. Finally, Dr. McDonald, who treated applicant in 2013-14, reviewed the reports from all of applicant's subsequent mental health providers and wrote a special report for the hearing. In Dr. McDonald's opinion, applicant "demonstrated both the willingness and the ability to engage in critical self-analysis and insight into his behavior and its impact on others." Dr. McDonald "enthusiastically" added his "voice to those who have expressed confidence in his fitness to practice law."

The board discounted the significance of those expert opinions because they did not—indeed they could not—offer an opinion on applicant's "moral character." But the significance of the expert opinions lies not in their ability to address the ultimate question; rather, it lies in their ability to address whether applicant suffers from a personality disorder, psychological condition, or other enduring or pervasive aspect of his personality that would cast serious doubt on his ability to evolve and reform his attitudes and behavior. That is a question that few members of the board and no members of this court are qualified to assess. And, without that expert opinion, we would be less persuaded by the overwhelming endorsement from applicant's friends, family, and co-workers regarding the outward evidence that he has reformed and rehabilitated his character.

Those supporters—a large and varied group—attest to applicant's present character and fitness to practice

law, and all were given complete access to the underlying records in this case. Those who have known applicant since before his misconduct, including his first ex-wife, described the positive changes that they have seen in applicant since he left law enforcement. Those who met applicant after his misconduct, including law school classmates, professional acquaintances and colleagues, and applicant's current wife, all insisted that applicant's past bears no resemblance to the person that they know today. Not one reference, many of whom are women, observed the abuse of power, dishonesty, or objectification of women that applicant demonstrated in his past misconduct. Applicant testified that the references not only describe who he is today, but also serve as motivation for him to live up to the character that the references describe.

We place particular weight on the references provided by the attorneys and staff at Vidrio Park & Jarvis, LLC. They are aware of the ethical and professional demands on an attorney and have directly observed applicant doing the work of a lawyer as a certified law student, including interacting with clients and representing them at trial. Although applicant's work for the firm appears to have presented opportunities for him to abuse his position of power or to exploit those who were less powerful, none of the hearing witnesses from the firm—whether supervisor, colleague, or support staff—observed any concerning behavior. And, despite being aware of applicant's prior misconduct, they have supported him throughout the application process and want him to join the firm as a full attorney.

The board was unpersuaded by the strength of applicant's character references, however, because it was not convinced that applicant had sufficiently accepted responsibility for his misconduct, as illustrated by his characterizing his victimization of vulnerable women as "consensual" contacts or mere "boundary violations." According to the board, the "record does not demonstrate Applicant's genuine remorse, or even understanding, that he used his position to take advantage of and victimize vulnerable people."

Although we agree that applicant's use of the word "consensual" on his Bar admission application in March 2017

appears legalistic and is not well chosen in this context, we are persuaded that the record as a whole, including applicant's subsequent descriptions of his behavior, demonstrates that applicant understands and appreciates the harmful nature of his misconduct. Applicant emphasized numerous times that he now understands that the power differential between himself and the women whom he met while a police officer at times affected their willingness to tolerate his advances. Applicant repeatedly expressed remorse—the "tremendous amount of shame and regret" that he feels— for how his conduct affected others. Admittedly, it can be difficult to distinguish between empty statements of regret and true rehabilitation of character. But we do not question the genuineness of applicant's remorse, which appears to be the result of critical and extensive self-examination that began when he started psychotherapy not long after his resignation from the police department. It is significant to our assessment that Dr. Kolbell—a public member of the board and trained psychologist—had confidence in the genuineness of applicant's remorse. Dr. Kolbell was the only board member to have heard applicant describe his remorse at both the small panel interview and the character review hearing, and he authored the minority opinion recommending admission.

It appears that a primary reason the board questioned applicant's reformation was his denial of JF's hearsay statements, which the board expressly found to be "credible."[5] We have difficulty placing that much weight on applicant's denial, however, when there is so little basis for assessing the accuracy of the JF allegations.[6] Although JF's lawyer, who attended her 2012 interview with Rappe, may have credibly described JF's recounting as involving "indicia of

---

[5] The final board opinion walks a fine line with respect to the JF allegations. Although the board cited as evidence of applicant's lack of candor his denial of JF's allegations, which it expressly "credit[ed] as true," it also noted that "the Board would still recommend denial of admission even if this event had not occurred."

[6] We note that the state's denial of a professional license on the basis of hearsay allegations can raise due process concerns. *See Cole/Dinsmore v. DMV*, 336 Or 565, 588, 87 P3d 1120 (2004) ("[W]hen important governmental decisions are based on determinations of fact, due process usually requires an opportunity to confront and cross-examine adverse witnesses."). But we resolve this case on subconstitutional grounds.

believability"—as the board emphasized—JF did not testify at the hearing. As a result, she was not available to explain the inconsistencies within the allegations themselves or to clarify how closely her perception of events—particularly years later—aligned with the actual events. Finally, JF's extremely serious suggestion that applicant falsely arrested her by manipulating her failure of the field sobriety test and then delayed taking her into the station so that he could engage in sexually oriented and inappropriate conversation "to imply there was some way out of her predicament by favor" is contrary to the documentary record of the arrest. Under the circumstances, applicant's continuing denial of JF's hearsay allegations does not cause us to question his reformation or candor.

The board's view that applicant lacked credibility with regard to JF's allegations seemingly influenced its view of two other incidents to which it pointed as evidence that applicant lacks candor, a view that we do not share. First, the board highlighted the fact that applicant later corrected a statement that he made during his panel interview. As noted above, applicant initially told the interview panel that Rappe's reports, although incomplete in some respects, contained the complete list of the women with whom applicant had engaged in sexual contact after meeting them in the course of official duties. A few days later, applicant voluntarily corrected that statement and supplied the names of two additional women that he had not disclosed to Rappe. In light of all the circumstances, we are inclined to view applicant's statement during the interview as an inadvertent error that he promptly took steps to correct, which has little effect on the overall analysis.

The board also reasoned that applicant lacks candor because the board did not find credible applicant's explanation for sharing Rappe's hearing testimony with Weaver—namely, that applicant was investigating potential impeachment evidence against Rappe. The board points out that, at the time when applicant shared the video of Rappe's testimony with Weaver, the record remained open only for limited purposes, which did not include additional impeachment evidence. The board suggests that applicant was more likely seeking retaliation against Rappe for his testimony.

We do not share the board's skepticism. The board retained the discretion to open the record to other relevant evidence. In fact, the board further opened the record to investigate applicant's conduct in sharing Rappe's testimony with Weaver. It is not implausible that, if Weaver had been able to confirm his suspicion about Rappe's veracity, the board might have admitted that additional impeachment evidence. And, if Weaver's suspicion about Rappe's veracity had proved accurate, that might have supplied impeachment evidence.

Thus, we are persuaded by the uniform opinion of the psychiatric experts that applicant's past misconduct was not the product of a personality disorder or other enduring psychological condition—in other words, that reformation is possible. And we are persuaded by applicant's many and varied character witnesses that he has accomplished the kind of transformation of attitudes, mental health, and behavior that make him an applicant who presently possesses the good moral character and fitness to become a member of the Oregon State Bar. Ultimately, although the board's skepticism of reformation is understandable, we accept the sincerity of applicant's statement to Dr. Linn:

> "Having gone through that experience of letting people down and shaming myself, I looked in the mirror[,] how I was, and I don't want to be that person anymore. I don't view women or sex in the same way that I used to."

And we are persuaded that applicant presently possesses the good moral character and fitness to practice law.

Although we are convinced that applicant has genuinely reformed and has demonstrated that he presently possesses the good moral character necessary for admission to the Oregon State Bar, we appreciate that applicant is not asking that we admit him without conditions. Applicant has managed to reform his destructive attitudes toward women and has developed an awareness of the harm that his abuses of power caused, but the public needs assurance that applicant will be able to maintain those new patterns of thinking and adhere to appropriate behavior through the occupational stress that he will undoubtedly encounter as a new lawyer. As suggested by Dr. Linn, those concerns can

and should be addressed through a conditional admission. Applicant is therefore subject to the following terms of conditional admission:

1. The period of conditional admission shall continue for 48 months from the date of applicant's admission.

2. Within 30 days of the date of admission, applicant shall establish an ongoing relationship with a mental health treatment provider with experience addressing boundary violations and power differentials. For a period of at least two years, applicant shall have at least monthly counseling sessions with that treatment provider, at his own cost, that are at least one hour in length and include supportive counseling focusing on boundary violations, power differentials, and relapse prevention strategies. After two years, applicant shall follow the recommendation of the treatment provider with respect to the need for any further counseling.

3. During the period of applicant's conditional admission, he shall be monitored for compliance by the Oregon State Bar's State Lawyers Assistance Committee (SLAC) and shall agree to the terms that SLAC considers to be appropriate for applicant's monitoring agreement.

4. Applicant shall submit to SLAC an annual report from his mental health treatment provider for each of the first two years of admission and thereafter to the extent that the provider recommends ongoing treatment. The report shall summarize applicant's progress with respect to boundary violations, power differentials and relapse prevention strategies, and it shall specify the provider's recommendations for future counseling.

5. Applicant shall refrain from pursuing a sexual or romantic relationship with any current or former client.

6. SLAC shall submit quarterly reports to Disciplinary Counsel of the Oregon State Bar, confirming that

applicant has complied with all conditions of his admission. The first of these reports shall be due 90 days after the date of applicant's admission.

7.  In the event applicant fails to comply with any term or condition of this opinion, or Disciplinary Counsel has reason to believe that applicant has failed to comply with the conditions set out in this opinion in any regard, Disciplinary Counsel may petition this court to revoke the conditional admission in accordance with procedures set out in BR 6.2(d).

8.  If applicant complies with all terms and conditions set out in this opinion, the term of his conditional admission shall expire 48 months from the date of admission, and he shall be admitted to practice unconditionally thereafter without further order of this court.

Applicant is conditionally admitted to the practice of law.