Submitted on the record March 16, admission denied October 26, 2006

In the Matter of the Application for
Admission to Practice Law of:

STEVEN ROBERT ZIELINSKI,
*Applicant.*

(SC S52768)

146 P3d 323

Steven Robert Zielinski, *in propria persona*, filed the briefs.

Jeffrey D. Sapiro, Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

Before De Muniz, Chief Justice, and Carson, Gillette, Durham, Balmer and Kistler, Justices.*

PER CURIAM

---

\* Riggs, J., retired September 30, 2006, and did not participate in the decision of this case. Walters, J., did not participate in the consideration or decision of this case.

**PER CURIAM**

Steven Robert Zielinski (applicant) has applied for admission to the practice of law in Oregon. The primary issue presented is whether the record contains clear and convincing evidence that applicant has the requisite character and fitness to practice law.

We review the record *de novo*. BR 10.6. An applicant for admission to the practice of law has the burden of proving by clear and convincing evidence that he or she is of good moral character and is fit to practice law. *See In re Rowell*, 305 Or 584, 588 n 2, 754 P2d 905 (1988) (so holding, citing *former* BR 7.5); Rule for Admission (RFA) 9.45(6) (in character review proceeding, applicant must establish by clear and convincing evidence the requisite character and fitness to practice law). On review, we determine that the record before us lacks clear and convincing evidence of applicant's good character and fitness to practice law, and, therefore, we deny his application for admission.

ORS 9.220 codifies the standards for admission to the practice of law in Oregon:

"An applicant for admission as attorney must apply to the Supreme Court and show that the applicant:

"(1)   Is at least 18 years old, which proof may be made by the applicant's affidavit.

"(2)(a)   Is a person of good moral character and fit to practice law.

"(b)   For purposes of this section and ORS 9.025, 9.070, 9.110, 9.210, 9.250 and 9.527, the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law.

"(3)   Has the requisite learning and ability, which must be shown by the examination of the applicant, by the judges or under their direction * * *."

RFA 1.05(1) amplifies on the concept of "fitness to practice law":

> "As used in these Rules for Admission of Attorneys, unless the context requires otherwise:
>
> "(1) 'Fit to practice law' or 'fitness' means an applicant demonstrates a level of conduct, mental health, judgment, and diligence that will result in adequate representation of the best interests of clients, including participation in the legal process according to the Disciplinary Rules of the Oregon Code of Professional Responsibility."

The court has delegated to the Board of Bar Examiners the responsibility in the first instance to receive applications for admission, to administer appropriate testing, to investigate each applicant, and to make recommendations regarding admission. RFA 2.10.

Applicant submitted his application for admission to the practice of law in Oregon in October 2004. He is over the age of 18 years, graduated from an accredited law school, and passed the February 2005 Oregon bar examination. However, the application, and the Board of Bar Examiner's investigation of the applicant, led the board to question whether applicant has the requisite good moral character and fitness to practice law. By letter dated September 20, 2005, the board recommended that the court deny the application because:

> "1. He has not established by clear and convincing evidence that he has the requisite character and fitness to practice law; and
>
> "2. Based on the information available to the Board, the Board is unable to determine whether he possesses the good moral character and fitness to practice law as required by ORS 9.220(2)(a)."

(Footnotes omitted.) In that letter, the board identified a number of incidents in which applicant's actions caused the board concern. The letter was accompanied by a copy of the application and what appear to be materials accumulated by the board in the course of its investigation, including the transcript of an interview of applicant by a "small board."[1]

---

[1] The board's *Policy and Procedures Re: Character and Fitness* authorize appointment of a small board, which is a subgroup of the full board consisting of

The small board questioned applicant regarding incidents that the Board had identified. Those included an incident that occurred at the University of Illinois College of Law in which applicant accused a law student, with whom he formerly had had a friendship, of cheating; a defamation action that applicant had filed against an assistant dean at the University of Illinois; an incident at the Pasco Airport in the State of Washington that had culminated in applicant's arrest for disorderly conduct; and applicant's contention that an Oregon lawyer and a municipal court judge had engaged in a "smear" campaign when applicant ran for Hermiston Municipal Court Judge. The small board also interviewed applicant about an incident that occurred in the Umatilla County Circuit Court that culminated in applicant filing a complaint with the Oregon State Bar against the deputy district attorney prosecuting a criminal case and a complaint against the trial judge with the Commission on Judicial Fitness and Disability. We discuss those incidents in greater detail later in this opinion.

In the course of the interview, the small board asked applicant to submit various documents and papers relating to those matters. Applicant did so, and the record that the Board submitted with its letter containing its adverse recommendation includes those materials.

Thereafter, the small board determined that a reasonable possibility existed that applicant had a psychological condition affecting his fitness to practice law and recommended that applicant participate in a psychological evaluation. The full board approved that recommendation and

two lawyer members and one public member of the Board. Paragraph 22 of the board's policy statement provides:

"If the small Board concludes, based on the applicant's record or statements or information obtained from third persons, that the applicant has a recent pattern of substance abuse or psychological condition affecting fitness to practice law, the small Board may recommend that the Board require the applicant, at his or her own expense, to submit to an examination by a medical or psychological specialist approved by the Board. If the Board approves this recommendation and requires such an examination, the small Board may, depending on the results of the examination, recommend that:

"(a) The applicant be unconditionally admitted;

"(b) The applicant be conditionally admitted, as described in paragraphs 30 and 31; or

"(c) A full Board hearing be convened."

arranged for a psychological evaluation, at applicant's expense, with a particular mental health professional. Applicant declined to participate in the evaluation, citing his inability to pay the anticipated cost of the examination.

At that point, RFA 9.10(1)(a) authorized the board to convene a character review proceeding before a hearing panel. Respecting a character review proceeding, RFA 9.10 provides:

> "(1)  *Initiation*. A hearing panel shall commence a proceeding, to be known as a character review proceeding:
>
> "(a)   Upon Board of Bar Examiners' referral of a matter to a hearing panel, or;
>
> "(b)   In any matter where the Oregon Supreme Court does not accept the Board of Bar Examiners' recommendation to admit an applicant to practice, if the Board's recommendation to admit was made without a hearing panel having conducted a character review proceeding. See Rule 9.60(7).
>
> "(2)  *Purpose*. The hearing panel, in its character review proceeding, shall inquire into whether an applicant possesses the requisite character and fitness to practice law in Oregon."

The board's Rules for Admission prescribe detailed procedures for the conduct of a character review proceeding.[2] In this case, however, none of those events occurred, because, as

---

[2] Upon initiation of a character review hearing, RFA 9.15 requires the chair of the board to appoint a special investigator. The special investigator may prepare a proposed statement "of the matters asserted or charged" and generally is responsible for prosecuting the proceeding on behalf of the board. RFA 9.20. RFA 9.35 provides, among other things, for notice to the applicant of the "matters asserted or charged and the applicant's burden of proof" and identifies the procedural rights of the applicant in the proceeding. RFA 9.40 provides for discovery, including depositions, subpoenas, and exchanges of lists of witnesses and exhibits. RFA 9.45 addresses recording and transcribing of the record of the hearing, evidentiary issues, exhibits, oaths and testimony, and other aspects of the hearing itself, including that the applicant has the burden of proving by clear and convincing evidence that the applicant has the requisite character and fitness to practice law. RFA 9.50 addresses the hearing panel's decision-making process, and RFA 9.55 addresses the board's decision-making process; RFA 9.60 provides for review by this court of the board's decision.

noted, the board did not initiate a character review proceeding. Thus, when the board submitted its original recommendation to the court, the "record" consisted of the application, the transcript of the small board interview, documents that applicant had submitted as requested during that interview, and such other documents arising from the board's investigation and correspondence between the board and applicant as the board elected to provide.

In previous cases, when the board has made an adverse recommendation for an applicant's admission, a character review hearing preceded the board's recommendation, and the applicant had notice of the grounds on which the board questioned the applicant's character and fitness and of the opportunity to create a record by an adversarial process. However, here, as the board explained in its letter of September 20, 2005, to the court:

> "The Board did not convene a panel pursuant to [RFA]
> 9.05 because without the information requested of the
> applicant, i.e., the evaluation of a trained mental health
> professional approved by the Board, a hearing conducted
> pursuant to that rule would have been unproductive since
> the members of the Board could not reach a conclusion
> without the assistance of such an evaluation. See Rule
> 6.05(3) ('An applicant may be denied admission for refusing
> to provide the Board with information material to the
> Board's inquiry regarding the applicant's good moral char-
> acter and fitness to practice law.')"

On November 22, 2005, the applicant filed a petition for review of the board's recommendation. RFA 9.60 authorizes an applicant to petition this court for review of a board "decision." Although, as noted, the board's "decision" often follows the occurrence of a character review hearing, the term "decision" also embraces any final determination by the board that rejects an application for admission, including those instances, such as in this case, in which no character review hearing occurs.

■        We turn to a procedural question concerning applicant's petition for review. A quantity of written materials accompanied the Board's adverse recommendation and applicant's petition for review. Applicant's petition for review

makes various factual assertions without citations to any record, and, therefore, we cannot readily determine whether the record before us, such as it is, supports those assertions. Further, applicant included with his petition for review numerous letters from friends and colleagues of applicant that they wrote after the board had made its adverse recommendation to the court. Obviously, the board has not considered those materials.

The materials accompanying the board's decision and applicant's petition highlight the evidentiary conundrum that we face, in part because a character review hearing did not precede the board's decision in this case. A character review hearing affords both parties an opportunity to engage in discovery, to disclose to the other parties documents on which a party intends to rely, and to offer and object to evidence, and otherwise provides an orderly means of making a reliable record. *See* RFA 9.35 to 9.45 (describing procedure). The process followed here did not provide that opportunity. Nevertheless, subject to one exception that we discuss below, neither applicant nor the board has objected to a full consideration by the court of the various materials submitted by the board and applicant. Therefore, we have considered those materials in addressing the petition for review.

The one exception relates to a report of a psychological evaluation of applicant. In his petition for review of the board's adverse recommendation, applicant questioned the board's authority to request a psychological evaluation at all. He also questioned the propriety of the conditions that the board had imposed, including that the mental health professional administer personality tests, that the psychologist report his raw scores to either the board or to its psychologist member,[3] and that the mental health professional determine whether the applicant suffers from delusional paranoia.

On December 6, 2005, this court determined by order that the board had the authority to request a psychological evaluation, but that the applicant should have the opportunity to propose different terms and conditions for

---

[3] The public member of the small board that considered this application was a psychologist.

accomplishing the evaluation. That order further provided that the court would postpone a decision on the merits of the application for six weeks to give the board and applicant an opportunity to arrive at mutually acceptable terms for an evaluation, to have the evaluation take place and a report prepared, and to allow the board to consider the report and make any further recommendation to the court that it wished to make.

The parties attempted to negotiate conditions for a psychological evaluation, but failed to come to full agreement. Nevertheless, applicant participated in an evaluation by a mental health professional mutually acceptable to applicant and the Board. The psychologist prepared a report. However, one of the points on which the parties were unable to come to agreement was this: applicant contended that a psychologist-patient privilege attended any evaluation, and that the board could not evade the privilege by requiring the psychologist to disclose the evaluation to the board. Applicant, in turn, voluntarily submitted the report to the board and this court, subject to applicant's insistence that only board members, the members of this court, and one of this court's staff lawyers could consider the report.

RFA 2.15 provides:

"Unless expressly authorized by the Supreme Court, the Board of Bar Examiners shall not disclose any of its records, work product or proceedings in carrying out these activities for the Supreme Court except the Board may release an applicant's admissions file to: (1) a special investigator appointed under Rules 9.15 to 9.20; (2) the Oregon State Bar's Disciplinary Counsel when an applicant seeks Supreme Court review of an adverse admissions recommendation; (3) Counsel appointed by the Board when an applicant initiates civil proceedings against the Board in connection with the applicant's application; or (4) admissions authorities in other jurisdictions which guarantee the confidentiality of admissions materials to the same extent as required under Oregon law."

Applicant declined to consent to disclosure of the psychological report to the persons identified in RFA 2.15. Therefore, the board declined to consider the report or to modify its recommended disposition of the application.

As noted, applicant has submitted a copy of the report to the court in a sealed envelope and has limited its disclosure essentially to the members of the court. If this court considered the psychological report that applicant has submitted in this case and included information from that report in the court's opinion—as we would, if we deemed the discussion of that information helpful in explaining our decision—we would violate the limitations that the applicant has attempted to place on disclosure of the report.

In our view, the impracticality of applicant's limitations on our consideration of the report is reason enough to reject the report. However, in imposing them, applicant demonstrates an even more fundamental misunderstanding of the legal context that pertains here: He has no authority to impose conditions or limitations on this court's consideration and use of evidence that he submits to demonstrate his character and fitness to practice law. Because the court has not authorized or accepted those limitations, we have declined to consider the report.

We turn, then, to examining applicant's claims in light of the record that we have before us. Applicant is a 1982 graduate of the Honors Program in Medical Education at Northwestern University Medical School. He has been licensed as a physician and surgeon in Illinois since 1984 and in Oregon since 1985. Applicant became board-certified in internal medicine in 1996. In addition to practicing medicine for a number of years, including, apparently, emergency room work, applicant briefly served as Vice-Dean for Academic Affairs at the College of Medical Sciences in Katmandu, Nepal.

Applicant also graduated *magna cum laude* from the University of Illinois College of Law in 1991 and was admitted to the practice of law in Illinois in May 1993, and remains in good standing on inactive status as a member of the Illinois State Bar Association. His admission there was not without its difficulties. The dean of the University of Illinois College of Law declined to certify that applicant was a person of good moral character. That, together with an allegation that applicant had stalked a law student with whom he formerly had had a personal relationship, his allegation that the

same law student had cheated in a trial advocacy class, and his defamation action against an assistant dean at the University of Illinois, resulted in the Illinois Board of Admissions to the Bar initiating what appears to be the equivalent under Oregon law of a character review hearing. That hearing resulted in a unanimous decision affirmatively to recommend applicant for admission to the bar, and, in due course, applicant was admitted to the practice of law in Illinois.

We are not bound by the decision of the State of Illinois regarding whether the incidents that occurred there are grounds for denying applicant admission to the practice of law in Oregon. Nevertheless, the allegations regarding applicant's complaint that a law student had cheated and the nature of his relationship with that student, although potentially serious, do not detain us long, in part because the record of those incidents is not well-developed.[4] We shall not consider those allegations in our determination in this case.

As noted, ORS 9.220(2) provides, in part, that

"the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation."

That statute also provides that "[t]he conduct or acts in question should be rationally connected to the applicant's fitness to practice law." RFA 1.05(1) also requires that we focus on

"conduct, mental health, judgment, and diligence that will result in adequate representation of the best interests of clients, including participation in the legal process * * *."

The board's letter to the court expresses concern about several matters, including a defamation action that applicant filed in federal court in Illinois in 1992 and an event that the parties refer to as the Pasco Airport matter. The board provided the following summaries of those matters:

---

[4] By the time that the Oregon Board of Bar Examiners inquired, the Illinois Board of Admissions to the Bar, pursuant to its records retention policy, had destroyed most of the record of its character review hearing for applicant.

"1.  Dr. Zielinski filed a defamation lawsuit in Illinois federal court in 1992 alleging that one of the named defendants had made quoted statements in a public meeting. Dr. Zielinski withdrew the lawsuit after a tape recording of the meeting conclusively established that the accused defendant had not made the statements. When asked about this during the Small Board Interview, Dr. Zielinski stated that the quoted language in the complaint was based on the recollections of 3-5 persons who had been in attendance at the meeting. However, when confronted by the Small Board with a contemporaneous statement to a reporter at the time he withdrew the lawsuit that the quoted language was based on the recollections of *ten* persons, Dr. Zielinski stated:

> " 'It probably got to that many, but I knew of about three to five. I mean there were a lot of people there and I didn't get the names of all the ones who initially came up to me. You had to go with what you had at the time that you put the suit together.'

"(Exh. 10, p. 17) (emphasis in original).

"2.  Dr. Zielinski was arrested at the Pasco Airport in October 2001. When asked by the Small Board to explain the circumstances that lead to his arrest, Dr. Zielinski stated that one of the security officers had held up a sum of cash removed from his checked luggage and asked Dr. Zielinski if he wished to take it in his carry-on rather than leave it in his checked luggage. Dr. Zielinski further explained:

> " 'When she [the security guard] held that up in the air, she basically gave a signal to every human being that here's a schmuck with a lot of money. Go get him. And I had a choice and I knew it instantly. If I take that money and I put it in my carry-on bag, somebody will come after me and the carry-on bag. If I take that money and it goes back into the suitcase, wherever that suitcase goes, there's going to be a race from baggage claim to get to that suitcase because it's instant free money. And here is a person who is supposed to be devoted to safety and security and she basically made me a target and I wasn't happy.'

"(Exh. 10, pg. 19) Dr. Zielinski was arrested and detained by the National Guard after further interaction with airport officials. (Exh. 7, pp. 4-5)[.]"

Two concerns arise from applicant's actions relating to the defamation action. First, applicant made inconsistent statements about the number of witnesses who reported the allegedly defamatory statement to him. Second, the tape recording of the meeting conclusively confirmed that none of the witnesses on which applicant purportedly had relied had reported the facts accurately. As a consequence, applicant's defamation action was without a basis in fact.

The problem that the Pasco Airport matter raises is not that applicant disapproved of the manner in which the airport security guard had dealt with his property. Rather, it appears that, without any basis for doing so, applicant attributed to the security guard the intent to invite other persons to rob him of his money (*i.e.*, "Go get him."). That is not, in our view, an ordinary (or even reasonable) reaction. Moreover, applicant allowed his anger toward the security guard and other airport officials to escalate to the point that the National Guard representatives present at the airport had to arrest and detain him.

Also of concern to us is applicant's conduct surrounding an incident in the Umatilla County Circuit Court that occurred on September 15, 2003. The state had charged the wife of a physician, Dr. Meharry, with whom the applicant had worked in Hermiston, with certain criminal offenses. Applicant accompanied Meharry and his wife to a hearing. At one point in the course of that hearing, the lawyers for both the defendant and the state left the courtroom to meet with the trial judge in chambers. During that time, applicant was conversing loudly enough with Meharry about the case that a police officer serving as a security officer in the courtroom could hear what applicant was saying. According to the security officer, applicant said, "[T]he only good cop is one with a bullet in his head."[5] The security officer cautioned the applicant not to speak about the case because there were witnesses in the courtroom. When applicant asked where the

---

[5] Applicant disputes that he said those words, but he concedes that he said something to the effect that, if a police officer ended up with a bullet in the head

witnesses were, the officer pointed to the woman seated immediately in front of applicant, that witness being Huxel, a female detective. Applicant responded, "Oh, that's what that is!"

Applicant continued to talk loudly enough that a court clerk entered the judge's chambers and informed those present about the disruption in the courtroom. One of the defendant's lawyers said that he would take care of the problem. That lawyer escorted applicant outside the courtroom, they talked briefly, and both returned to the courtroom.

A second police officer, Deputy Drago, was in the courtroom; applicant considered Drago to be his friend.[6] Drago attempted to caution applicant about talking in the courtroom. At least one observer characterized applicant as standing up as if to take off his coat and engage in a fight with Drago before going outside the courtroom to talk with him. Eventually, both returned to the courtroom. When the judge and the lawyers returned to the courtroom and the court went back on the record, the trial judge announced that he was recusing himself from the case.

The following day, the deputy district attorney handling the case, Ladd, filed a motion to transfer the case from Hermiston to Pendleton on four grounds: (1) the case involved 40 witnesses, and the Hermiston courtroom facilities were too small to accommodate witnesses waiting to testify; (2) security in Hermiston was less effective than in Pendleton; (3) the trial judge's recusal presented difficulties for the state, because the state thought that the defendant's release should be revoked immediately, in part because she allegedly had been tampering with witnesses; and (4) defense counsel planned on filing a large number of motions that otherwise would require a visiting judge to travel from Pendleton to Hermiston for hearings. In support of the part of her motion referring to court security, Ladd stated,

---

laying on the applicant's lawn, applicant would refuse to treat the police officer. We decline to decide here which report of the incident is correct, but we do note that we do not think that accepting applicant's version of what he said places applicant in a more favorable light.

[6] Drago, who at one time served as Sheriff of Morrow County, submitted a letter of reference in support of the applicant's application for admission.

"This case has potential for physical injury; during the judge's conference in chambers on 09/15/03, the deputies had to remove one Steven Zielinski, who told * * * Huxel, a witness for the state, that police officers ought to have a bullet through the head."

Ladd also wrote in the motion, "In the most recent hearing, a security risk arose when one witness for the defense made a threatening comment to a police officer witness."

Applicant disputed those statements on the grounds that no deputy removed him from the courtroom and he had not directed his statement about bullets in the heads of police officers to, or otherwise threatened, Detective Huxel or any law enforcement personnel. Ladd, however, rebuffed applicant's attempt to get her to change her statements. Applicant also attempted to contact the trial judge, but the trial judge declined to talk to him, because the matter involved the case from which he had recused himself. Applicant then filed complaints with the Oregon State Bar against Ladd and against the trial judge with the Commission on Judicial Fitness and Disability (the commission).

The record before us regarding applicant's complaint against the trial judge is limited. The commission declined to provide a copy of the complaint, citing its confidentiality policy. Applicant also was unable to furnish a copy of his complaint, because he had not retained a paper copy and the computer on which he had prepared the complaint suffered damage that resulted in an inability to retrieve the document. In addition to not having a copy of the complaint, applicant has not articulated the basis for his complaint against the trial judge. By applicant's own statement, the trial judge was not in the courtroom when most of the incident took place. In his complaint to the Bar regarding the conduct of the deputy district attorney, applicant stated that the trial judge had returned to the courtroom during the time when applicant had gone outside the courtroom escorted first by the defendant's lawyer or later by one of the courtroom security officers or, perhaps, both. However, the remainder of the record indicates that the trial judge had not returned to the courtroom by that time and, therefore, could not have had

any personal knowledge of events that occurred in the courtroom.

Even if the trial judge had had personal knowledge of some of the events that, collectively, made up this incident, it is not readily apparent to us how the trial judge could have violated the Code of Judicial Conduct by recusing himself from the case and not responding to the applicant's request to talk to the judge about the incident. In his complaint to the Bar regarding the deputy district attorney, applicant wrote the following in regard to the trial judge's role in the incident:

> "I have been accused of stating that 'police officers ought to have a bullet through the head.' * * * Further, it is claimed that I had to be forcibly removed from the courtroom because of my statements and that I created a 'dangerous' courtroom situation. * * * [B]oth Judge Wallace and [the] prosecuting DA * * * are aware of the totally and completely false nature of these claims, since they were PRESENT IN THE COURTROOM WHEN I WAS SUPPOSEDLY REMOVED!

> "* * * * *

> "I attempted to deal with this matter through Judge Wallace, who had recused himself from the relevant case (State vs. Kathy Meharry) on the day of this alleged incident. Judge Wallace, through his secretary, Nancy, encouraged me to stay by my phone and await a call from the Judge. I made several follow-up contacts by phone and received additional requests to remain by my phone. That call never came. ONE WEEK LATER, Nancy contacted me to inform me that Judge Wallace could not talk to me if the conversation involved the Meharry matter in any way. One wonders if the Judge has similar difficulty deciding whether to go to the bathroom or if he just pees on himself."

(Capitalization in original.) In that same complaint, applicant states,

> "Not only are the alleged claims false, they have an evil and pernicious nature that invites hostility, harassment and reprisals. I have received threats against my person and my livelihood as a result of these false accusations and the threats have forced me to increase my personal security and that of my friends and loved ones. I have been forced to seek

a concealed weapons permit and to only travel in the community with a weapon near at hand * * *.

"Since many of the threats have come from members of law enforcement—or those claiming to be part of law enforcement, I now regard all police and law enforcement officers with suspicion and any approach by them as a potential to attack me or do me harm * * *.

"* * * * *

"I fear that this entire situation cannot help but end badly, likely with a violent showdown. Government authorities have shown an unwillingness to address this matter and likely will not do so until someone gets killed. * * * I also fear that the inevitable confrontation will cause me to have to choose between my own life and that of an overzealous and ill-informed member of law enforcement."

In response to a letter dated May 13, 2004, from Bar Disciplinary Counsel, applicant stated,

"I don't doubt there are security issues in the Hermiston Court. But I am not one of them. The court security deputies might qualify as dangerous, however. Who responds to what is allegedly a serious, open threat with those chilling words 'Don't talk about the case!' Wow, I'm scared! Are they allowed to have bullets in their guns? Who put the bullets in for them? Can they shoot straight?"

In a letter dated July 9, 2004, in which applicant requested that the State Professional Responsibility Board review the Bar's dismissal of applicant's complaint against the deputy district attorney, applicant wrote,

"I also want to make it clear that I am proud, yes, PROUD of my 'offensive' statement in the courtroom that day. I stand fully behind my comments. In fact, I would say that they also apply, wholeheartedly, to Ms. Ladd, Ms. Cooper,[7] Judge Wallace and the rest of the Umatilla County Justice System. You may act accordingly. I would also point out, just this last weekend, we buried a young man who died violently as a result of lies and deceptive statements put out by government agents. The problem will not go away. I have

---

[7] Ms. Cooper is the assistant disciplinary counsel for the Oregon State Bar who handled the applicant's complaint against Deputy District Attorney Ladd.

warned repeatedly about the escalation of this matter into violence. I can do no more. I have nothing to lose."

Put bluntly, it strains credulity to accept applicant's portrayal of Umatilla County as simmering with the kind of violence that applicant describes or his assertion that his life is as threatened as he claims.[8] To the extent that applicant is unpopular with law enforcement personnel in that community, he overlooks that, by his own admission, he uttered in a courtroom in a voice loud enough to be heard by others, including a police detective witness, words to the effect that he would not treat a police officer who had been shot in the head. To the extent that applicant's statement was repeated in the community, that fact had more to do with applicant's utterance of the statement in a loud voice in a public setting in the presence of police officers than with Ladd's possibly inaccurate summary and characterization of the statement in her motion.

As the record before us reflects, applicant has made other statements that reflect positively on him. Applicant also has been involved in other litigation, both as a medical expert advising lawyers regarding medical matters, and in connection with a business in which applicant sold timekeeping software. His conduct in those matters causes us no concern. Finally, applicant has supported his petition for review with letters of recommendation from a number of respected persons.

Nevertheless, applicant's conduct, especially during and following the Umatilla County Circuit Court incident, gives us great cause for concern. That conduct occurred recently and reflects a disrespect for the rights and personal safety of others. From the record as applicant has chosen to limit it, it appears that applicant loses perspective when he engages with others in various positions of authority. While it is true that the public expects lawyers to assert their rights and those of their clients in a variety of legal settings, this court, the Bar, and the public also expect lawyers to conduct themselves in a rational, civil, and professional manner,

---

[8] Applicant also gave inconsistent information to the police about whether he has a concealed weapon permit and whether he has carried arms in the community.

especially in the presence of witnesses in a courtroom. Applicant's conduct in the Umatilla County Circuit Court matter and the ensuing complaints to the Oregon State Bar and the Commission on Judicial Fitness and Disability display the kind of lack of perspective and judgment that reflect poorly on applicant's character and fitness to practice law. Applicant's conduct in those matters was not a one-time slip-of-the-tongue. Rather, his conduct reflects a pattern of behavior toward public officials that incorporates irrational insults[9] and accusations of misconduct with little or no evidentiary support. Moreover, applicant has used threats of violence or harm to intimidate others and then bragged about his threats.

Viewing applicant's conduct in its entirety, we conclude that, to paraphrase ORS 9.220(2)(b), applicant's conduct "would cause a reasonable person to have substantial doubts about [applicant's] honesty, fairness and respect for the rights of others and for the laws of the state and the nation." The conduct of applicant discussed above occurred in several settings, including a courtroom, in which a reasonable person would expect a lawyer to conduct himself in a manner that reflects respect for the rights of others and for the responsibility and authority of public officials and employees attempting to execute their duties. Those circumstances confirm that applicant's conduct is rationally connected, as ORS 9.220(2)(b) requires, to his fitness to practice law. We conclude, therefore, that applicant has failed to show that he "[i]s a person of good moral character and fit to practice law." ORS 9.220(2)(a).

*In re Covington*, 334 Or 376, 382, 50 P3d 233 (2002), counsels us that,

> "[a]ny significant doubt [about an applicant's character and fitness] should be resolved in favor of protecting the public by denying admission."

---

[9] Even as recently as the date on which applicant submitted his psychological evaluation report to the board, applicant wrote the following in referring to Marlyce Gholston, the Executive Director of the board:

> "The attached material is *confidential* for Marlyce Gholston. If you don't know what that means—get a dictionary. If you are still not sure—get another job."

(Emphasis in original.)

The record in this case leaves significant doubt in our minds about applicant's character and fitness to practice law. Therefore, we follow *Covington* and deny the application.

Admission denied.