Submitted on the briefs April 19, application for admission to practice of law denied December 2, 2021

## In the Matter of the Application for Admission to Practice Law:
## KEVIN RICHARD KAUFFMAN,
*Applicant.*
## (SC S067932)

499 P3d 801

Following its investigation of applicant's character and fitness to practice law, the Board of Bar Examiners recommended that applicant be denied admission to the Oregon State Bar; applicant contended, instead, that he had met his burden to show that he possesses the good moral character to practice and that he therefore should be admitted, even if only conditionally. *Held*: Applicant had not established by clear and convincing evidence that he has the requisite good character to practice law.

The application for admission to the practice of law is denied.

Application for admission to the practice of law in Oregon.

Kevin Kauffman, Portland, filed the briefs *pro se*.

Susan R. Cournoyer, Assistant Disciplinary Counsel, Tigard, filed the brief for the Oregon State Bar.

PER CURIAM

The application for admission to the practice of law is denied.

**PER CURIAM**

In this lawyer admission proceeding, the Board of Bar Examiners (board), represented by the Oregon State Bar (Bar), recommends that applicant be denied admission to the Bar, following its investigation of his character and fitness to practice law. Rule for Admission of Attorneys (RFA) 6.05. Applicant contends that he has met his burden to show that he possesses the good moral character to practice, as required by ORS 9.220(2)(a), and that we therefore should admit him, even if only conditionally. On *de novo* review, we agree with the board that applicant has not met his burden and we deny his application for admission.

## I.   FACTS AND PROCEDURAL BACKGROUND

Applicant applied to become a member of the Bar in 2018 and again in 2019. The board's adverse recommendation is based on a number of considerations, most notably certain omissions from his applications; ensuing developments relating to both those omissions and the board's further requests for information; and applicant's responses during an interview with a small panel of board members. *See generally In re Halttunen,* 367 Or 360, 362, 478 P3d 488 (2020) (court has charged board with investigating and evaluating applicant character and fitness (citing RFA 2.10(2); RFA 6.05)). We first briefly describe the key omitted information and then summarize other material from the applications and related factual and procedural background.

### A.   *Omitted Information—Ohio Employer and Related Matters*

In 2016 and 2017, applicant worked in Idaho for an Ohio data company (Ohio employer) in a fraud-reporting unit. According to applicant, while employed there, he was subject to harassing treatment by a supervisor and he reported having been subject to further mistreatment after reporting the harassment. He also observed business-related conduct that he thought troublesome and sought to report it. The employer eventually suspended him and ultimately, in July 2017, discharged him. Throughout the suspension and discharge process, the employer accused applicant of misconduct; for his part, applicant refused to sign

documentation that he thought inaccurately described his conduct.

Following his discharge, applicant complained about the Ohio employer on various websites. In September 2018, one of the employer's executives, Miller, filed police reports with the City of Columbus, stating that applicant had sent her multiple emails and social media communications, with some causing her to fear for her safety. Based on those reports, applicant was charged in municipal court with two misdemeanors—menacing by stalking (mental distress) and telephonic harassment—with accompanying arrest warrant notices. The employer also obtained a civil restraining order against applicant, apparently related to the same or similar communications. For his part, by this time living in Oregon, applicant grew concerned about certain conduct directed toward him in Oregon that he thought that the employer or its attorney had instigated, and he reported at least one such incident to local law enforcement.

B. *Applicant's 2018 and 2019 Bar Applications*

1. *Information about employment and criminal matters*

Applicant graduated from law school in 2009 and first applied for admission to the Bar in April 2018. Among other things, the Bar application asks for "yes" or "no" answers to several questions, with direction to supplement "yes" answers with additional information. Two such questions raised issues here: (1) whether applicant ever had been cited, arrested, charged, or convicted of a criminal offense ("criminal matters question"); and (2) whether applicant ever had been discharged or asked to resign from employment ("discharge question"). Additionally—and also raising an issue here—an applicant must list the applicant's current and previous five employers and supervisors, including volunteer work ("employer question").

On his 2018 application, applicant answered "yes" to the criminal matters question, listing three incidents: a 2000 arrest for a domestic disturbance involving a romantic partner (either no charge filed or dismissed); a 2004 arrest for disorderly conduct (involving the same partner; dismissed); and a 2009 or 2010 misdemeanor charge for reckless driving

(plea), with brief explanations.[1] He also answered "yes" to the discharge question, but he identified only a cellular company as an employer that had discharged him (in early 2018); he did not name the Ohio employer. Finally, when answering the employer question, applicant listed a combination of three current and three former employers and volunteer organizations, generally covering the years 2014 to 2018. He did not, however, list the Ohio employer. Applicant took, but did not pass, the July 2018 bar examination.

Applicant again applied for admission in 2019, submitting his application in March. On the criminal matters question, he listed the same three incidents as in his 2018 application and added two more: a 2002 disorderly conduct citation (again involving the same partner as in other incidents); and a 2018 traffic citation. He also disclosed that the 2009 or 2010 reckless driving incident had included a charge for driving under the influence of intoxicants. On the discharge question, he repeated the 2018 cellular company employer information and added another 2018 discharge, from a merchandising company, but again did not list the Ohio employer. And, on the employer question, applicant again did not list that employer. He did, however, include one vague reference to that employer in a different part of his application—immediately following his attached narrative descriptions about his criminal charges—where he wrote:

> "2018-2019. In dispute with former employer. I have not sued yet, still gathering evidence. The exchanges have become tense including requiring me to file reports."

Applicant provided no additional detail and did not identify the employer.

2. *Other information provided to support applicant's 2019 application*

Applicant provided other information on his 2019 application, or in later supplements, in an effort to show his good character and fitness to practice. As to his legal academic background, applicant passed all his law school

---

[1] Applicant submitted his 2018 application before the conduct that prompted the Ohio criminal charges was alleged to have occurred.

courses with no misconduct incidents; he took but did not pass the California bar examination (in 2010, 2013, and 2015), although he did receive a favorable moral character review (in 2011). Applicant also provided references showing favorable employment and rental history, and he described a long history of participating in tennis as a player, teacher, and athletic director, with favorable references and no conduct-related complaints. Finally, after the 2018 Oregon bar examination, applicant participated in the Bar's "ReBar" program, which helps law school graduates retaking the examination and required completing sessions with the Oregon Attorney Assistance Program (OAAP).

## C. *Additional Factual and Procedural Background*

### 1. *Fall 2019 communications with admissions staff*

Applicant passed the July 2019 bar examination. In September, before the results were released, the Admissions Coordinator, Hansen, notified him that his character and fitness investigation was not complete, and applicant provided information that he understood to be missing, but none related to the Ohio employer. On or around October 10, Hansen asked applicant for information about the "Ohio matters" to which he cryptically had referred in his 2019 application, and he confirmed that he would respond in writing. In the meantime, applicant began emailing an Assistant City Attorney in Columbus, Phillips, regarding the Ohio criminal matters. At some point, according to applicant, Phillips told him on the phone that the criminal case was "closed."

On October 14, 2019, applicant submitted an addendum to his 2019 application, which summarized the "Ohio Matters" as follows: (1) Applicant had started to resolve harassment charges against him; (2) he was in a civil dispute with the Ohio employer; (3) during his employment, he had been harassed by a supervisor, in part relating to his sexual orientation, and he had been harassed after reporting that conduct; (4) also during that employment, he had reported employer misconduct relating to certain business processes; (5) after he had reported "the continued misconducts against me," the employer started the discharge process,

but applicant had refused to sign inaccurate documentation alleging misconduct on his part; (6) he had learned that the employer had filed a restraining order against him and had reported him to Ohio law enforcement, but he never had been to Ohio nor been contacted by Ohio law enforcement; (7) based on his communications with Phillips, he thought that "the case [was] closed"; and (8) he had filed his own police report (in Oregon) against the employer, regarding a purportedly troubling incident that he thought that the employer had instigated. In his addendum, applicant again did not identify the Ohio employer, although he provided a hyperlink to a website purportedly containing complaints about one aspect of the employer's business. In response to the addendum, Hansen asked for additional documents relating to the Ohio matters and applicant confirmed that he would gather and provide them.

Over the next two days, however, applicant engaged in a series of email exchanges with both Hansen and the Bar's admissions manager, Wood, in which applicant became increasingly resistant, pejorative, and hostile. For example, he asserted that Hansen's requests for information were unwarranted and inappropriate, stated that he did not need to comply, and suggested that Hansen had a conflict of interest. Eventually, after Wood repeated the requests[2] and also reminded applicant that his communications with the board and admissions staff were relevant to the board's character and fitness determination, applicant provided some additional information. He stated that the Ohio matters had involved "legal and criminal proceedings," in which the Ohio employer—which he finally identified by name— and its executive who had filed the charges, Miller, were the "criminals." And, in an email containing some confusing and nonresponsive passages, he added that he had "answered the questions posed and given the information needed," and again questioned Hansen's motives. In response, Wood

---

[2] Among other things, Wood requested (1) specific information about the Ohio employer (including identifying the employer and providing relating reports); (2) specific information about applicant's interactions with Ohio and Oregon law enforcement related to the employer; (3) copies of applicant's written communications with Phillips; and (4) narratives explaining his conduct, the events leading to criminal charges, and why the charges had not been disclosed on his 2019 application.

wrote that applicant's failure to fully cooperate could be considered in the board's admission determination. Applicant immediately responded by vaguely comparing admissions staff's "unrealistic requests" to "'war'" and asserting that he would "stand firm on [his] rights and how [he would] be treated."

The following day, in an email entitled, "RE: The 'investigation' created by *** Wood and *** Hansen," applicant sent Wood some additional information and copies of documents relating to the Ohio employer. Applicant added that he had been the victim of criminal conduct perpetrated by the employer; that he had been stalked and harassed; and that he should have obtained a restraining order himself. The attachments included a May 2018 letter from applicant to the United States Attorney's Office in Dayton, reporting fraud and other misconduct by the employer and certain employees, and three letters that applicant had sent to attorneys for either the employer or Miller, or both, reporting that Miller had broken laws and directed others to stalk and harass him.

Through a public records request, admissions staff confirmed the September 2018 Ohio criminal charges against applicant—as noted, menacing by stalking (mental distress) and telecommunications harassment—with indicators that both were in "closed" status. By November 2019, staff obtained more detailed records, showing allegations from Miller that, since May 2018, applicant had sent her more than 50 harassing emails and social media communications, with the nature of some communications causing her to fear for her safety.

## 2. *December 2019 small panel interview*

The board asked applicant to appear for an interview with a small panel composed of four board members ("panel"), which took place in December 2019. RFA 6.05(2). During that interview, the panel asked about the Ohio matters and applicant's failure to disclose them on his 2019 application, as well as his employment history, earlier arrests and criminal charges, and the tone of his emails to Hansen and Wood. Applicant answered all the panel's questions, but

many answers were contradictory, unclear, or incomplete, as summarized next.

First, applicant acknowledged that, on the employer question, he had not listed the Ohio employer as one of his previous five employers, but he denied any deceptive intent. Applicant confirmed that he had listed an older employer for whom he had not performed any work since 2015; he also disclosed to the panel yet another employer who had discharged him in 2018 and another short employment in 2018, neither of which had been listed on his 2019 application. The panel observed that, had the older employer from 2015 been omitted, the more recent Ohio employer chronologically would have been included, and it questioned whether applicant intentionally had listed only "positive" employment experiences. Applicant responded that, in response to the employer question, he had listed employers with whom he had had good working relationships.

Second, applicant acknowledged that he "definitely" should have included the Ohio employer on the discharge question. After initially appearing surprised that he had not included it on his 2018 application, he stated that he was not sure why he had not included it on the 2019 application, adding that he had no "exact answer" as to why he omitted it. Applicant also said that he may not have listed the Ohio employer because the related issues had been complicated and he did not know how much detail to provide. `

Third, when asked about the Ohio criminal charges, applicant provided unclear or contradictory responses about the nature of the underlying conduct, the date when he had learned about the charges, and the efforts that he had made to resolve them. As to the underlying conduct, applicant initially stated that it might have involved some argumentative communications with the Ohio employer's attorney. But he also acknowledged that he had complained, though not in a "threatening" manner, about the employer on his own social media accounts and in comment sections on other businesses' websites, and he acknowledged sending two emails to Miller. As to when he had learned of the Ohio charges, applicant varyingly stated that (1) he had learned about them

"last fall [or] last winter," but did not know for certain; (2) he had tried to get more information but never had been contacted by Ohio law enforcement; (3) he had "confirmed" the charges "this year" but had still been "piecing it together" when he had filed his application (in April 2019); (4) he was scared to contact Ohio officials; and (5) he definitively had learned about the charges when Hansen had asked about them. As to resolving the charges, applicant reported that Phillips had told him that the matters were closed, but then a county clerk more recently had told him that he needed to appear. Applicant added that Phillips had conveyed that, if he had any issue with Ohio law enforcement, then he should file a claim with the police bureau.

As to the Ohio employer matters generally, the following exchange is representative of applicant's responses during his panel interview:

"[Q:]   So *** here's what we're getting at[.] [The Ohio employer]—you've already said [that was] the biggest, *** most stressful, most frustrating experience you've had in a job, getting terminated, *** several workplans and reprimands, *** is that fair to say?

"[A:]   Hmm. Hmm. [affirmative response]

"[Q:]   That was all very memorable. [Then,] you have two bar applications that expressly ask whether you've been terminated, and you didn't include that in either one. You also have two applications in which they asked if there has ever been any civil proceeding, or have you ever been charged with any crimes, *** and you don't mention that. The most you mention, the most you reference, [is] a very vague, 'in dispute with former employer'—who you don't name, and you don't name the city and town—that you have not sued yet, you are still gathering evidence, exchanges have become tense, including requiring you to file reports.

"But here's the concern we have, it seems like when you are applying and you *** see the nature of these questions, you would know that that was something that we would need to know about and consider in evaluating your application. It feels like you intentionally excluded those so that it wouldn't have a negative effect on your application. *** [W]e can't think of another explanation, and that's why we're asking you if there is one.

"[A:]   There was no intent in mind. It, you know, * * * I've talked about [the Ohio employer] quite a bit here, I've talked to other people about [that employer.] When I've had that come up on job interviews, I've talked about it. So, * * * you know, * * * all I can do is apologize for that—that's something that should be on there and [I] apologize for it, I don't know what else to offer. Other than, I understand what you are saying, it's been said to me by all of you, so I get it, and I apologize, I'm acknowledging it should be on there, * * * that's something that's important, but I've been willing to talk about it and discuss the events that have happened there, discuss it now, or answer any questions relating to it. * * * I don't know what else I can do."

The panel also asked applicant about several of his emails to Hansen and Wood. Applicant acknowledged that some had been aggressive or hostile, uncivil, and reflective of impulsivity—recounting his frustration that his admission had been stalled after he passed the bar examination and his confusion about the process. He reported meeting with an OAAP counselor to discuss those communications and how to avoid sending similar ones in the future.

At the close of the interview, the panel asked applicant to submit certain documents and other information.

3.  *Additional procedural background and board recommendation*

In December 2019, applicant emailed an apology to Hansen. But, at some point, he learned from a different applicant that that applicant's investigation process had differed from his own in certain respects, which prompted him to think that he had been treated unfairly. In late January 2020, he wrote to Hansen and others, copying the Bar's General Counsel, accusing Hansen of treating him differently from the other (unidentified) applicant and characterizing a recent email from Hansen as a "threat." On the same day, applicant submitted an expanded supplemental statement that added the following brief information about the Ohio employer:

"I have received various information but trying to confirm what is true and not. I reported some of the things to police. This former [Ohio] employer has also involved the police,

the [latter] has not contacted me directly. My attempts to gather accurate information have mostly been ignored."

His statement also acknowledged yet another criminal charge that he had disclosed in his panel interview but not included in his applications, involving a 1996 physical altercation with a sibling (dismissed). Further, admissions staff—on its own—confirmed that applicant also had been cited for aggravated theft in 2003 (apparently dismissed), which he had not disclosed at any time.

Over the next several weeks, applicant sent many emails to Hansen, Wood, the Bar's General Counsel, and others. In response to outstanding requests for his 2018 emails and social media communications involving the Ohio employer, he did provide one communication to the employer, from 2017. Otherwise, he insisted that he already had disclosed all pertinent information. He also questioned Wood's authority and spoke in a pejorative manner to Hansen. Applicant also asserted that—as a minority based on his sexual orientation—he was being treated differently from a "white male heterosexual applicant," due to "'entitled' white privilege" and that staff had acted with a bias reflecting a desire to prevent a gay man from practicing law.

Meanwhile, admissions staff had asked Phillips—the City of Columbus attorney whom applicant had contacted in October 2019—for information about their conversations. Phillips responded by letter in March 2020, attaching four emails from applicant (and Phillips's responses). The first three emails were from October—emails that Wood repeatedly had asked applicant to provide, but he had not. During his panel interview, applicant had characterized his October communications with Phillips as his attempt to confirm the status of the Ohio criminal charges, with Phillips suggesting that he file a claim with the police bureau. But the three emails showed that applicant had threatened legal action against the city and any officers involved; vaguely alleged reckless and dishonest police conduct; and ultimately threatened to sue Phillips. In the fourth email, which applicant had sent to Phillips in late January 2020 after his panel interview, applicant made vague and incoherent references to negligence and criminality.

In May 2020, the board notified applicant that it had determined that he neither had met the essential eligibility requirements for admission, RFA 1.20 - 1.45, nor had established that he had the good moral character required by ORS 9.220(2)(a). *See* RFA 6.05(5) (setting out notice requirement for adverse recommendation). The board also told applicant that he could request an evidentiary hearing, RFA 9.01, and that, if he did not do so, the board would recommend denial. *See generally* RFA 9.35 - 9.45 (describing character and fitness review proceeding). Applicant did not request a hearing; instead, after the board filed its adverse recommendation in this court, applicant sought to oppose it. We then directed the board to file the record on which it had based its recommendation; applicant to file a petition under RFA 9.60(1); and both parties to file briefs, for resolution of the matter without oral argument. *See generally In re Zielinski*, 341 Or 559, 564-65, 146 P3d 323 (2006) (similar procedure, involving applicant petition filed in this court following adverse board recommendation and no evidentiary hearing below).

## II.   PRELIMINARY MATTERS

We first address two preliminary matters that applicant has raised.

### A.   *Board's Reliance on Phillips's March 2020 Letter*

Applicant first challenges the board's reliance on Phillips's March 2020 letter, sent to the board, because he did not know about that letter until the board filed its adverse recommendation in this court—which expressly referred to the letter and attached it.[3] He contends that the board improperly considered that letter in making its adverse recommendation, when it did not provide him with

---

[3] The board had not expressly referred to Phillips's letter in its May 2020 notice sent to applicant.

Applicant challenges only the content of Phillips's letter to the board—not the four emails from applicant that Phillips had attached. As noted earlier, Wood repeatedly had asked applicant for the first three emails (from October 2019), and applicant had purported to summarize his conversations with Phillips in that time period during his panel interview. The fourth email was sent by applicant after his interview—as were many other emails that the board provided as part of its record, to which applicant does not object.

a copy or an opportunity to respond. In his view, that course of events implicates procedural due process protections.

This case reaches us in an unusual posture, in that applicant did not request a character and fitness hearing, which would have "afford[ed] both parties an opportunity to engage in discovery, to disclose to the other parties documents on which a party intends to rely, and to offer and object to evidence, and otherwise provide[d] an orderly means of making a reliable record." *Zielinski*, 341 Or at 566; *see also id.* (on adverse recommendation and applicant petition with no hearing below, court considered all documents that parties submitted without objection; court did not consider one document to which the applicant had objected, for reasons not applicable here); RFA 9.35-9.45 (describing hearing procedure). We conclude that it is unnecessary to further consider Phillips's March 2020 letter or any arguments related to it because, as explained below, even without that letter, the record amply supports the board's adverse recommendation.

B.   *Board's Purported Disparate Treatment of Applicant*

Applicant also asserts that, in aspects of its character and fitness investigation, the board treated him differently from other similarly situated applicants without any rational basis, in violation of his equal protection rights.[4] He asks that we "correct" those procedural errors, to ensure equal treatment. The Bar responds that applicant was treated fairly; the board acted rationally and consistently with the rules; and admissions staff and the board ensured that applicant had received multiple opportunities to provide accurate information in response to the board's concerns.

Based on the limited information that applicant provides, we reject his equal protection argument. Applicant

---

[4] Applicant cites four instances of disparate treatment, after having consulted with one other unidentified applicant who had a small panel interview. He contends that, unlike that other applicant, (1) his own panel had four members (the other had three); (2) he was not given advance notice about who would be on his panel; (3) he was required to obtain a court order to secure certain documents from admissions staff; and (4) prior to his interview, admissions staff had shared with the panel one or more of his emails expressing his frustration with staff, casting him in a negative light.

purports to base that argument on different treatment afforded to another applicant, but he offers no supporting evidence—in the form of any affidavit or declaration or otherwise—of such treatment. We therefore have no basis for assessing his contention. *See generally In re Gatti*, 330 Or 517, 534-35, 8 P3d 966 (2000) (rejecting equal protection claim for lack of supporting evidence).

## III.   ADMISSION ANALYSIS

### A.   *Legal Standards*

Our task on *de novo* review is to determine whether applicant should be admitted to the practice of law, denied admission, or conditionally admitted. RFA 9.60(5). Several legal standards govern that determination. Most notably, under ORS 9.220(2)(a), an applicant must show that the applicant "[i]s a person of good moral character and fit to practice law"; conversely, under ORS 9.220(2)(b), a "lack of 'good moral character' may be established by reference to acts or conduct *** which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness[,] and respect for the rights of others," and for state and federal law. Additionally, various Rules for Admission set out requisite standards, essential eligibility requirements, and potentially disqualifying conduct that justifies further inquiry into character and fitness. *See* RFA 1.20 (attorney should have record of conduct demonstrating "a level of judgment" and diligence that will result in adequate client representation, "and that justifies the trust of clients, adversaries, courts, and the general public"); RFA 1.25 (listing essential eligibility requirements, including the ability to "[c]ommunicate honestly, candidly, and civilly with clients, attorneys, courts, and others"; to [d]emonstrate regard for the rights *** and welfare of others; and to comply with requirements of applicable law and the Rules of Professional Conduct); RFA 1.30 (listing potentially disqualifying conduct, including "[m]aking or procuring any false *** statement or omission of relevant information in connection with any bar application"; acts involving misrepresentation; and acts "demonstrat[ing] disregard for the rights or welfare of others"). Finally, applicants for admission have certain obligations, including a duty to cooperate

and comply with board requests, and a continuing duty to promptly report any change, addition, or correction to application information, including facts "that could reasonably bear upon the character and fitness of the applicant." RFA 4.25.

Applicant bears the burden of demonstrating good moral character by clear and convincing evidence. *See Zielinski*, 341 Or at 561 (describing the applicant's burden by quoting and applying the clear and convincing evidence standard set out in an evidentiary hearing provision, RFA 9.45(6), when reviewing an adverse recommendation with no hearing below). "Stated differently, applicant must show that it is 'highly probable' that [he] has the good moral character and fitness to practice law." *Halttunen*, 367 Or at 361 (internal citation omitted). Any substantial doubt about an applicant's character must be resolved in favor of protecting the public. *Id.* at 377.

B.  *Analysis*

After reviewing the record *de novo*, and as explained further below, we conclude that applicant's omissions from his 2019 application and his conduct throughout the board's investigation support the board's recommendation to deny admission.[5]

---

[5] In addition to the conduct just summarized, the Bar focuses on applicant's general criminal history and, as to the Ohio matters, his conduct toward the Ohio employer and the resulting criminal charges. The Bar adds that applicant has not sufficiently shown rehabilitation under RFA 1.40. Applicant counters that his conduct relating to the Ohio employer amounted to unproven facts; that none of his arrests or criminal matters related to deceit or moral turpitude; and that none bore any rational connection to the practice of law, as required under ORS 9.220(2)(b).

Because we conclude that applicant's conduct in omitting certain information from his 2019 application, coupled with his conduct throughout the board's investigation, supports the board's adverse recommendation, we need not address the parties' contentions about his criminal history or his conduct toward the Ohio employer, or whether he has shown sufficient rehabilitation since those events. *See generally In re Bernath*, 327 Or 422, 426, 962 P2d 685 (1998) (declining to consider each specific allegation proffered by the board, because the applicant's failure to disclose material information on his application and making false representations to the board—each standing alone—were sufficient grounds to deny admission, such that discussion of other allegations would not benefit the bench or bar). We limit our consideration of those additional matters to the context that they provide in understanding the problematic conduct that we have identified.

1.   *Omissions from applicant's 2019 application*

We begin with applicant's omissions from his 2019 application, most notably pertaining to the Ohio employer and related matters.[6] As part of submitting a Bar application, an applicant is required to attest that the admission determination depends on the truth and completeness of the answers provided in the application, together with information furnished with the application. And, as already noted, conduct that may disqualify an applicant from admission includes omitting relevant information in connection with a Bar application. RFA 1.30(c).

As to the Ohio matters, applicant included on his 2019 application only a cryptic narrative comment that he was in a dispute with an unidentified "former employer" and had not yet sued but was "gathering evidence," with tense exchanges "including requiring *me* to file reports." (Emphasis added.) He did not identify the Ohio employer on either the discharge or employer questions, and he did not include the Ohio charges—of which he acknowledged he had been at least generally aware at the time of his application—on the criminal matters question. As the panel members pointedly observed, his application appeared designed to conceal unfavorable information about his employment with the Ohio employer in 2016 and 2017, his discharge in 2017, and the ensuing criminal charges and civil restraining order in 2018. That misleading approach was punctuated by applicant's listing of an earlier employer for whom he had performed no work since 2015, as well as his comment that he had been required to file reports against an unidentified former employer, while misleadingly not also mentioning that the employer had been required to file "reports" against *him*, in the form of a restraining order and a criminal complaint.

At his panel interview, applicant offered varying justifications for omitting information related to the Ohio employer. He allowed, at one point, that the omissions may

_____

[6] As recounted earlier, applicant also omitted information about (1) another recent employment; (2) yet another employer who had recently discharged him—later disclosed in his panel interview; and (3) additional criminal history—some disclosed in his interview, and some discovered by admissions staff.

have been due to his concern about the ongoing complicated issues; at another point, he offered that he had listed only those employers (on the employer question) with whom he had good working relationships, although he did also list one other employer (on the discharge question) who had discharged him. He also stated that he had no specific explanation for omitting the information, which "definitely" should have been included at least on the discharge question, but that he had acted with no deceptive intent.

The Bar contends that applicant's stated justifications were neither logical nor credible, and we agree. Applicant clearly deliberated about whether to include any reference to the Ohio employer on his 2019 application, because he ultimately decided to include the vague reference to an unidentified former employer. He also clearly deliberated about which information to include when answering the three questions at issue, because he decided to include an employer for whom he had not performed any work since 2015, as well as a different employer who had discharged him about seven months after the Ohio employer had discharged him. Thus, applicant affirmatively acted in a manner designed to deter the board from considering information that may have raised concerns about his character.

In short, applicant's omissions from his 2019 application justified further inquiry, RFA 1.30(c), and his incomplete and inconsistent responses during the board's ensuing investigation, as discussed further below, continued to demonstrate a lack of good character. As this court wrote in *In re Bernath*, 327 Or 422, 427, 962 P2d 685 (1998):

> "It is essential that every applicant to practice law in Oregon fully disclose to the Board all information relevant to the applicant's character and fitness. Failure to disclose relevant information fully and candidly is a ground for the Board to recommend denial of admission. RFA 6.05(3). It also forms a basis for this court to deny admission. * * * Applicant was on notice of his obligation to disclose relevant information to the Board, both through the Rules for Admission of Attorneys and through the application itself, on which applicant acknowledged, by signature and under oath, his duty to disclose. Applicant's [limited] disclosure fell short of the degree of disclosure that he acknowledged

to be required of him. Because it raises significant doubts about his good moral character, applicant's failure to disclose his suspension \*\*\* constitutes a sufficient ground for denial of his application to practice law in Oregon."

(Internal citations omitted.)

2. *Lack of candor and cooperation during board's investigation*

An applicant for admission must "cooperate and comply" with board requests, and "report promptly \*\*\* any change, addition[,] or correction to the information provided in [the] application," including "any other facts or occurrences that could reasonably bear upon the character and fitness of the applicant." RFA 4.25; *see also* RFA 1.35(g) (stating that, in considering prior conduct, candor in admissions process is a potentially mitigating or aggravating factor regarding present good moral character). The Bar argues that applicant demonstrated a persistent lack of candor, notwithstanding multiple opportunities to disclose all relevant facts. And, the Bar continues, when confronted with his deceptive tactics during his panel interview, applicant provided "nonsensical and unbelievable explanations as to how he purportedly reached his conclusion that the omissions or misstatements were actually truthful." For his part, applicant reiterates that he did disclose, in his October 2019 addendum, the "crucial information" about the Ohio employer, including contextual information about the employment, a link to employer information, and his efforts to report purported misconduct by others and to resolve the criminal charges.

We agree with the Bar that applicant failed in his obligation to cooperate and comply with the board in its investigation, and that—throughout his interactions with admissions staff and the board—applicant displayed a lack of candor. Although the Bar relates many examples, the following are most illustrative.

First, as a general matter, when Hansen and Wood repeatedly requested specific information and documents from applicant in October 2019, he responded by providing only a minimal amount of the requested information and

otherwise challenged their authority to make the requests.[7] The panel similarly requested certain information at the close of the interview in December, but applicant again provided only minimally responsive information and otherwise insisted that he had fully cooperated, when in fact he had not. Indeed, before this court, applicant continues to insist that he cooperated with the investigation, but the record shows that what cooperation he did offer was only partial in nature and, to a notable extent, self-serving.

Second, applicant demonstrated a lack of candor when providing answers about his omissions during his panel interview. Although he responded to each question, many answers were incomplete, inconsistent, or contradictory. For example, when asked why he had omitted the Ohio employer from the discharge and employer questions, applicant varyingly stated that he was not sure why or had no explanation; that he had not been sure how much detail to include in light of the complex issues that had arisen; and that he had listed only those employers with whom he had had positive relationships.

Third, applicant displayed a pronounced lack of candor in his panel interview when discussing his October 2019 communications with Phillips about the Ohio criminal charges. Applicant told the panel that Phillips had told him that the case was closed, but also that, if desired, he could file a claim with the police bureau—suggesting that Phillips had offered some form of resolution by referring to a claim process. Notably, though, notwithstanding repeated requests from admissions staff, applicant never provided the board with his written communications with Phillips. And, when Phillips himself later did so, the communications showed that applicant repeatedly had threatened legal action against Ohio law enforcement and even against Phillips himself.

For his part, applicant emphasizes his perspective that, in his interactions with the Ohio employer, he broke no laws and was merely standing up for himself; in doing so, he

---

[7] Indeed, applicant did not even affirmatively identify the Ohio employer until after Wood repeated at least two earlier requests that he do so.

distinguishes cases involving applicants who had engaged in criminal conduct prior to admission. *See, e.g.*, *In re Taylor*, 293 Or 285, 290, 647 P2d 462 (1982) (earlier crime of theft; applicant had stated in an underlying proceeding that he had forgotten to pay for a stolen item, but then stated during admissions process that he had intended to steal the item). But applicant misses the point of *Taylor* and other cases. The key question is not whether applicant engaged in illegal or other problematic conduct at the time of the Ohio matters; instead, the question is whether he responded to the board's investigation with cooperation and candor. That was precisely this court's point in *Taylor*. *See id.* at 296 (perceiving lack of candor in the applicant's explanations of his earlier conduct and related proceedings, and emphasizing his "inconsistent, equivocal, and evasive" responses); *see also In re Fine*, 303 Or 314, 330, 736 P2d 183 (1987) ("[Applicant] *** continues to misstate the facts of [an earlier] crime and his involvement in it *** to gain admission to the bar. *** [He] has not shown himself to be a credible person.").

In sum, the record shows that applicant did not fully cooperate or comply with the board's requests, as required by RFA 4.25. *See also* RFA 1.30(c) (when assessing character and fitness, misleading statements or omission of relevant information in connection with a Bar application may be treated as cause for further inquiry); *Bernath*, 327 Or at 428-29 (during character and fitness investigation, applicant provided "no convincing explanation[]" for earlier misrepresentations, which in turn did "nothing to resolve [the court's] significant doubts regarding [his] moral character").

3.  *Nature of applicant's communications with admissions staff and others*

Essential eligibility requirements for admission include the ability to "[c]ommunicate honestly, candidly, and civilly" with clients, attorneys, court, and others; and the ability to "[c]onduct oneself with respect for and in accordance with the law[.]" RFA 1.25(c)(i), (iii). Here, the record shows that admissions staff sent several clear and courteous requests to applicant, seeking supplemental information related to his 2019 application and his cryptic comment about an unidentified former employer, and that he

responded with a pattern of accusatory, vitriolic, and hostile communications. Notably, applicant told the panel that he had come to realize that some of his communications had been aggressive and inappropriate, and that he was learning how to engage more deliberately. Nonetheless, he continued sending uncivil and accusatory emails—including to staff at the Bar and to Phillips—after acknowledging his need for improvement and reporting that he had made personal strides in that area.

In his briefing in this court, applicant claims that admissions staff "exaggerated" his behaviors and that, to the contrary, he conducted himself in a calm and patient manner, and provided requested information. We agree that applicant acted in a calm manner during his panel interview, and nothing in the record suggests that he acted uncivilly when communicating with others by phone. As extensively discussed, however, a significant amount of applicant's ongoing email communications—sent both before and after his interview to admissions staff, others at the Bar, and Phillips—were accusatory, hostile, and uncivil, contrary to RFA 1.25(c)(i) and (iii).

### 4. *Applicant's other arguments*

Applicant raises three other arguments. First, he contends that his conduct and statements were protected under the First Amendment to the United States Constitution because he was standing up to bigotry. Applicant does not elaborate on that constitutional claim, however, and nothing in the record suggests that any action taken by board or admissions staff bore any connection to applicant's sexual orientation.[8]

Second, applicant emphasizes that he made an additional disclosure of certain criminal matters to admissions staff, including incidents that the board had not known about otherwise, which went "above and beyond" and shows his "strong belief in honesty and full disclosure." But the overarching purpose of the admissions process is for

---

[8] To the extent that applicant contends that it is improper to rely on his conduct during the Ohio matters because his First Amendment rights were somehow violated in Ohio, we reiterate that the underlying Ohio matters do not bear on our ultimate conclusion to deny applicant's admission.

an applicant to provide complete and truthful information bearing on character and fitness that the board would not otherwise have. Applicant's belated voluntary disclosure of a particular criminal matter does not weigh in his favor.

Finally, applicant emphasizes the positive references that he provided to the board from all aspects of his life—including in employment, volunteerism, academics, sports participation, and housing. He argues that those references collectively establish a strong probability of his good moral character, notwithstanding mistakes during the admissions process. And he emphasizes his own motivation and passion to provide service to marginalized persons, arguing that denial of his application would amount to a "grave injustice."

We have no reason to doubt either the positive references that applicant provided or his sincerity in seeking to be an advocate for marginalized persons. The problem, however, is that his conduct in omitting certain information from his application for admission, his lack of candor and cooperation during the board's investigation, and his ongoing hostile treatment of admissions staff and others all significantly detract from his effort to prove that he possesses the good character required to practice.

## IV.   CONCLUSION

We reiterate that, in deciding whether to admit an applicant to the practice of law, our primary responsibility is to the public, to ensure that those who are admitted have the requisite sense of "ethical responsibility" and "maturity of character." *Bernath*, 327 Or at 429; *see also Taylor*, 293 Or at 296 (to same effect). As summarized in *Taylor*, 293 Or at 288, "[w]e cannot overstate the necessity that one who seeks admission to the Bar be of good moral character."

On *de novo* review of the record and materials that the parties have provided, we conclude that applicant has not established by clear and convincing evidence that he has the requisite good character to practice law, as required by ORS 9.220(2)(a). *See also Taylor*, 293 Or at 296 ("Reviewing the record, we are left with the impression that [the] applicant fails to appreciate the gravity of his conduct as it pertains

to his moral character [and] that [he] did not fully accept responsibility for his actions."). We therefore agree with the board's adverse recommendation and deny his application.

The application for admission to the practice of law is denied.